UNITED STATES DISTRICT COURT
FILED
AUG 5 - 2024
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

JUANICE RENE COLLINS-NEW, ISAIAH THOMAS NEW,
Individually and as Co-Administrators of the
ESTATE OF MONIQUE BROWN, Deceased,
Plaintiffs,

v.

**JURY TRIAL DEMANDED**

Case No. 24CV 733

BUFFALO GENERAL HOSPITAL,
KALEIDA HEALTH SYSTEM,
PFIZER INC., HOSPIRA INC.,
LUCY CAMPBELL "DR. CAMPBELL",
ELAINE DAVID, JOHN DOE NURSE, and
JANE DOE HOSPITAL STAFF 1-5,

Defendants.

**COMPLAINT**

Plaintiffs, pro se, for their Complaint against Defendants, allege as follows:

**INTRODUCTION**

1. This is a civil rights action seeking damages against Defendants for violating the constitutional rights of African-American patient Monique Brown, causing her wrongful death through deliberate misconduct, negligence, and failures to provide adequate medical care as she was a patient at Buffalo General Hospital in February 2024.

2. The allegations describe a horrific and agonizing series of events in which White hospital staff blatantly disregarded Ms. Brown's wishes, her dignity, and ultimately her life, administering hundreds of milligrams of morphine and midazolam with a 12-hour period without the patient's family's consent, while unilaterally withdrawing life-sustaining treatment over her advance directive and the objections of her legal healthcare proxies, leading to Ms. Brown's agonizing

death which was witnessed by her family. When Ms. Brown's family tried to intervene, Buffalo General Hospital called hospital security personnel on Ms. Brown's legal healthcare proxies and other family members.

3. Defendants' actions resulted in Ms. Brown being administered excessive and inappropriate doses of potent medication to artificially induce respiratory depression and hasten her death, causing her to experience prolonged suffering, pain and an inhumane death by suffocation over more than an hour.

4. The conduct of Defendants shows an appalling disrespect for patient autonomy, a deliberate overriding of Ms. Brown's advance directives **(Exhibit A)**, the coercion of her healthcare proxies, the use of security forces to intimidate her family advocates, and the apparent hastening of her death based on her race and her family's objections to the withdrawal of care.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' claims under 42 U.S.C. § 1983 for violations of constitutional rights.

6. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims.

7. Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in this District.

## PARTIES

8. Plaintiff Collins-New is the sister of the deceased Monique Brown and was designated as her alternate healthcare proxy with legal authority to make medical decisions on her behalf. She advocated for Ms. Brown's rights and treatment preferences in the days before her death. As the healthcare proxy, Collins-New has a fiduciary relationship with the deceased that confers standing to bring claims related to the principal's medical treatment. (See Stein v. Doukas, 98 A.D.3d 1024, 1025 (2d Dep't 2012) (recognizing healthcare proxy's standing to assert claims on behalf of principal)). Hospital staff called security on Ms. Collins-New when she requested a copy of her sister's medication list.

9. Plaintiff New is the nephew of the deceased Monique Brown. He was present at Buffalo General Hospital and personally witnessed the events leading up to her death, including the administration of excessive medication, and the mocking of her agonal breathing by hospital staff. Hospital staff called security on Mr. New when he recorded his aunt struggling to breathe. As a family member with personal knowledge of the relevant facts, Mr. New is an interested party with standing to bring this action on behalf of the estate. (See Matter of Maurer, 2010 NY Slip Op 50960(U) (Sur. Ct. Nassau County 2010) (allowing niece to petition for letters of administration as interested party)).

10. Defendant Buffalo General Hospital is a hospital located in Buffalo, New York and owned by Defendant Kaleida Health System. Buffalo General Hospital receives federal funding through Medicare and Medicaid reimbursements.

11. Defendant Kaleida Health System is a non-profit healthcare provider that owns and operates Buffalo General Hospital and other facilities in Western New York. It receives federal funding.

12. Defendant Pfizer Inc. is a pharmaceutical corporation incorporated in Delaware with its principal place of business in New York. It is the parent company of Defendant Hospira Inc.

13. Defendant Hospira Inc. is a pharmaceutical company incorporated in Delaware with its principal place of business in Illinois. It manufactures the drugs midazolam and morphine that were improperly administered to Ms. Brown.

14. Defendant Dr. Lucy Campbell was at all relevant times a physician employed by Buffalo General Hospital to provide medical care and treatment to patients, including Ms. Brown.

15. Defendants John Doe Nurses 1-3 were at all relevant times nurses employed by Buffalo General Hospital to provide medical care and treatment to patients, including Ms. Brown. Their true identities are not currently known to Plaintiffs.

16. Defendants Jane Doe Hospital Staff 1-5 were at all relevant times employees or agents of Buffalo General Hospital involved in the care and treatment of Ms. Brown. Their true identities and roles are not currently known to Plaintiffs.

## STANDING

17. Plaintiffs New and Collins-New have standing to bring this action on behalf of the Estate of Monique Brown as interested parties and fiduciaries of the deceased.

18. As a blood relative who witnessed the events surrounding Monique Brown's death, Isaiah New has a direct interest in the estate proceedings and the right to petition the court for relief related to those events. (See N.Y. Est. Powers & Trusts Law § 1-2.13 (defining "interested party" to include distributees and fiduciaries)).

19. As the designated healthcare proxy, Ms. Collins-New has legal authority to make decisions regarding Monique Brown's medical treatment and to bring claims on her behalf, even after her death, based on the fiduciary obligations owed. (See N.Y. Pub. Health Law § 2982 (authorizing healthcare agent to make any and all healthcare decisions on principal's behalf that principal could make); Stein, 98 A.D.3d at 1025).

20. The egregiousness of the hospital's alleged misconduct and the need to preserve evidence warrant allowing Plaintiffs to promptly file this action as interested parties to protect the estate's rights, rather than waiting for the formal appointment of an estate administrator. (See N.Y. Est. Powers & Trusts Law § 11-3.2(b) (allowing interested party to bring survival action that could have been brought by decedent))

21. If the court appoints an estate administrator while this action is pending, the complaint can be amended to substitute that representative as the real party in interest prosecuting the claims on behalf of the estate. (See N.Y. C.P.L.R. 1003 (allowing substitution of estate representative as plaintiff))

22. The egregiousness of the hospital's alleged misconduct and the need to preserve evidence warrant allowing Plaintiffs to promptly file this action as interested parties to protect the estate's rights, rather than waiting for the formal appointment of an estate administrator. The court has discretion to allow an interested party to commence a survival action that the decedent could have brought if living. (See N.Y. Est. Powers & Trusts Law § 11-3.2(b) ("No cause of action for injury to person or property is lost because of the death of the person in whose favor the cause of action existed. For any injury, an action may be brought or continued by the personal representative of the decedent."); Matter of Mannix v. Mannix, 10 Misc. 3d 1077(A) (Sur. Ct. Nassau County 2006) (granting temporary letters of administration to decedent's son to pursue wrongful death action before full estate administration completed)).

**FACTS**

17. In February 2024, Monique Brown, age 54, was a patient at Buffalo General Hospital receiving treatment for end-stage chronic obstructive pulmonary disease (COPD).

18. Ms. Brown had previously executed an advance healthcare directive and appointed her sister Juanice Collins-New and fiance Marty Roosvelt Mitchell as her healthcare proxies with legal authority to make medical decisions on her behalf if she became incapacitated.

19. In multiple conversations with her proxies and family members while she still had capacity, Ms. Brown clearly expressed her wish to receive all life-sustaining treatment and interventions should her condition worsen. (N.Y. Pub. Health Law §§ 2981, 2994-a; Cruzan v. Director, MDH, 497 U.S. 261, 284 (1990) ("The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions."))

20. On or about February 13, 2024, nurses at Buffalo General were overheard discussing discharging Ms. Brown immediately due to concerns about her son, without any input from Ms. Brown's designated healthcare proxies.

21. On or about February 14, 2024, Ms. Brown was transferred to a different floor of the hospital while unconscious, without notifying or obtaining consent from her healthcare proxies in violation of New York Public Health Law. (N.Y. Pub. Health Law § 2994-b(3) (requiring healthcare providers to consult with patient's healthcare agent before making decisions); Cruzan, 497 U.S. at 289 ("Nor does the Due Process Clause permit the State to define inadministrable any statutory scheme. Missouri must accept the remaining challenge that the procedural requirements of the State's persistent vegetative state procedures deny the constitutional right to a procedural due process."))

22. Over the next several days, hospital staff were approving medical decisions and interventions for Ms. Brown based on consultations with whichever family members happened to be present, deliberately circumventing the authority of her appointed healthcare proxies. (N.Y. Pub. Health Law § 2994-d(3)(a)(i) (requiring healthcare providers to comply with decisions of patient's healthcare agent); Schloendorff v. Society of N.Y. Hospital, 211 N.Y. 125, 129-30 (1914) ("Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages."))

23. On or about February 21, 2024, when Ms. Brown's proxy Ms. Collins-New requested a list of the medications being administered to Ms. Brown, nurses called hospital security to have Ms. Collins-New removed rather than provide the requested information. (N.Y. Pub. Health Law § 18(2)(c) (giving patients and their authorized representatives the right to access medical records); Cruzan, 497 U.S. at 289)

24. The following day, on February 22, 2024, the hospital abruptly called a "family meeting" at which Dr. Campbell and other staff misled Ms. Brown's healthcare proxies about the severity of her condition, falsely claiming she had only days left to live.

25. Under this pretext and pressure from hospital staff, Ms. Brown's proxies were coerced by hospital staff, including hospital social worker Elaine David, into signing a Do Not Resuscitate (DNR) order while Ms. Brown was asleep, against Ms. Brown's previously expressed wishes to receive all care. (Cruzan, 497 U.S. at 284; N.Y. Pub. Health Law § 2994-d(4)(a)(ii) (prohibiting providers from unduly influencing healthcare agent's decisions); Schloendorff, 211 N.Y. at 129-30).

26. Immediately after the DNR was signed, and over the objections of Ms. Brown's family members present, hospital staff removed Ms. Brown's CPAP/BiPAP mask which she used occasionally, and feeding tube that had been providing her supplemental respiratory support and nutrition. Hospital staff refused to replace Ms. Brown's CPAP/BiPAP mask when requested by her fiance and primary health care proxy Marty.

27. Defendants then initiated a morphine drip administering 1 mg/hr of morphine and 8 mg/hr of morphine intravenous injections, despite repeated requests from the family to provide a lower dosage as excessive morphine can dangerously suppress respiratory function. (Boyle v. State, 146 A.D.3d 1442, 1445 (4th Dep't 2017) ("Plaintiffs also submitted evidence that the dosage of morphine administered to decedent was excessive and caused her death."))

28. That evening, in the presence of Ms. Brown's family members, a male nurse who is defendant John Doe Nurse 1 began administering additional 2 mg bolus doses of morphine to Ms. Brown every 15 minutes from approximately 10 pm to 8 am.

29. Despite already being on 1 mg/hr continuous morphine drip, and dosing the patient with 8 mg/hour of IV morphine, the nurse also administered 10 mg midazolam, a powerful sedative, to Ms. Brown stating it was for "anxiety" even though she was unconscious at that point. The nurse

made the disturbing statement to her sister "It won't be long now" before leaving, causing her sister extreme distress.

30. Plaintiffs have photographic evidence of the vial of midazolam manufactured by Defendant Hospira that was used by the nurse, as well as an audio recording of the "family meeting" where proxies were misled.

31. Plaintiffs also have video evidence showing the nurses who are defendants Jane Doe Nurses 1-2 entering Ms. Brown's hospital room to override the hospital's software medication delivery platform in order to repeatedly to inject her with 2 mg doses of morphine approximately every 15 minutes, totalling hundreds of milligrams of intravenous morphine within a 16 hour period until 2 pm on February 23, 2024, one hour before her death.

32. The nurses are overheard on the video mocking Ms. Brown's visible respiratory distress, stating "oh she's making guppy breaths!" and chuckling. Guppy breathing, also known as agonal breathing, refers to a medically critical state indicating that death is imminent without immediate intervention. (See Farag E, Argalious M. Anesthesia for Organ Transplantation. In: Gropper MA, ed. Miller's Anesthesia. 9th ed. Elsevier; 2020:2088-2117. ("The combination of benzodiazepines and opioids can cause significant respiratory depression and airway obstruction, especially in patients with pulmonary disease.") *See* allegations at paragraph 35.

33. By approximately 1 pm on February 23, 2024, Ms. Brown's oxygen saturation levels had dropped to a critically low 29% due to the excessive morphine and midazolam that had been administered against her family's wishes.

34. Between 12-1 pm that day, despite Ms. Brown's visibly agonizing state, Defendant hospital staff called security on Ms. Brown's kin for advocating for his loved one and objecting to the intentional suppression of her respiratory efforts.

35. Ms. Brown remained in a state of severe respiratory distress, gasping for air and choking for hours, suffering an inhumane and agonizing death by suffocation due to the inappropriate co-administration of excessive morphine and midazolam. Ms. Brown spent more than seven weeks admitted to Buffalo General in alert condition, able to eat and talk with weeks of stable vitals of 100% oxygen saturation, normal blood pressure and normal respiration rate as of 7 pm on February 22, 2024. Yet within hours of hospital staff inducing the DNR at 1 pm in retaliation for Ms. Juanice Collins-New's requests for her sister's medication list and stated intent to file a complaint, Lucy Campbell, who is audible in the "family meeting" recording, ordered and

caused nurses to administer excessive morphine and midazolam administration to hasten Ms. Brown's death, manually and deliberately overriding red flag alerts in the hospital's medication delivery software protocols to do so. Two hours after Ms. Brown's healthcare proxy left the hospital (her sister, the proxy who had threatened to report the hospital staff to the Department of Health for calling the police when she requested her sister's medication list), staff removed Ms. Brown from the heart rate and oxygen saturation monitor at 8:34 PM on February 22, 2024. Ms. Brown's other relative, who was in the hospital room with her after her healthcare proxy Ms. Juanice left the hospital, sent a text message to the family stating, "They unplugged the machine monitoring all her vitals and replaced it with this." The accompanying photo shows hospital staff removing Ms. Brown from the monitor that connects to the nurse's station and alerts them to patient vitals, and placing her on a handheld Phillips IntelliVue MX40 that they placed under Ms. Brown's hospital bed. Hospital staff then began administering highly excessive doses of morphine intravenously. The photo also shows an active alarm on the portable Phillips IntelliVue MX40. The alarm on the photo indicates that Ms. Brown was in a state of medical emergency at 8:34 PM as indicated by the Phillips IntelliVue MX40 (Helling v. Carey, 83 Wash. 2d 514, 519 (1974) ("Failure to observe a patient carefully and respond to significant symptoms is a breach of duty.")). Despite this, hospital staff silenced the alarm and did not provide the necessary medical attention. At 12:44 AM on February 23, 2024, Ms. Brown's family became aware that the hospital staff was administering midazolam to Ms. Brown. This was done despite her advance directive requesting all life-sustaining treatment and without the consent of her healthcare proxies (Cruzan, 497 U.S. at 278 ("The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions.")). Ms. Brown's condition rapidly deteriorated within hours thereafter and, as a direct result of this inappropriate and unwarranted co-administration of powerful respiratory depressants against Ms. Brown's wishes and best interests, she remained in a state of severe respiratory distress, audibly gasping for air and slowly suffocating for hours. Ms. Brown endured a visibly inhumane, agonizing, and torturous death by drug-induced asphyxiation, deprived of basic oxygen, subjected to the horrific experience of air hunger, and unable to breathe despite her body's desperate struggle to survive, all due to the grossly negligent and unethical conduct of the Defendants in artificially suppressing her respiratory drive and ending her life prematurely through pharmaceutical means. (See Boyle v. State, 146 A.D.3d 1442, 1445 (4th Dep't 2017)

(finding potential liability for overmedication causing patient's death); People v. Steinberg, 79 N.Y.2d 673, 680 (1992) (recognizing "agonal breaths" or "agonal respiration" as a sign that death is imminent without immediate intervention)). Our 54-year old daughter, mother, sister and grandmother was pronounced at 3:00 pm on February 23, 2024. Ms. Brown's funeral was held and her surviving male children and grandchildren were pallbearers.

36. Ms. Brown was pronounced dead within 12 hours of the first witnessed administration of midazolam by Ms. Brown's family. The deliberate removal from the vital signs monitor, silencing of vital signs monitor and the inappropriate administration of midazolam without consent, in combination with the high doses of morphine already being given, directly contributed to her rapid deterioration and death. (Wendland v. Sparks, 574 N.W.2d 327, 328-29 (Iowa 1998) (recognizing potential liability for a physician's "affirmative act that caused the patient's injury or death")). Plaintiffs have subsequently learned that the combination of morphine and midazolam was used by the State of Oklahoma in carrying out executions by lethal injection, causing condemned inmates to experience agonizing air hunger and suffocation before death. (Glossip, 576 U.S. at 949 (Sotomayor, J., dissenting) (noting expert testimony that midazolam doses as low as 0.04-0.07 mg/kg can cause death)).

37. Defendants' actions were taken with deliberate indifference to Ms. Brown's constitutional rights and a reckless disregard for her life, evincing a horrifying lack of respect for her autonomy, dignity and right to be free from cruel and unusual practices.

38. Defendants' conduct was outrageous, shocks the conscience, and violated Ms. Brown's clearly established rights under the Fourteenth Amendment's Due Process Clause to refuse unwanted medical treatment and have her advance directives honored. (Cruzan, 497 U.S. at 278 ("The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions."); Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (assuming a liberty interest in refusing unwanted medical treatment))

39. Defendants' actions were motivated at least in part by racial animus and discrimination against Ms. Brown and her African American family members, who were subjected to intimidation tactics and a hostile environment for attempting to advocate for Ms. Brown's rights and wishes.

## CLAIMS FOR RELIEF

### COUNT I: 42 U.S.C. § 1983 - Fourteenth Amendment Substantive Due Process (All Plaintiffs against All Defendants)

40. Plaintiffs reallege and incorporate the preceding paragraphs as if fully restated herein.

41. At all times relevant, Defendants acted under color of state law in their respective roles as a state-regulated hospital, healthcare providers, and pharmaceutical companies involved in Ms. Brown's medical care and treatment.

42. Defendants, while acting under color of state law, deprived Ms. Brown of rights secured by the Fourteenth Amendment to the U.S. Constitution, including her substantive due process right to refuse unwanted medical treatment. (Cruzan, 497 U.S. at 278; Washington v. Glucksberg, 521 U.S. at 720)

43. Defendants deliberately disregarded Ms. Brown's clearly expressed wish to receive life-sustaining treatment through the improper withdrawal of her CPAP/BiPAP mask and feeding tube providing respiratory support and nutrition.

44. Defendants further violated Ms. Brown's constitutional rights by coercing her court-appointed healthcare proxies into revoking her advance directive for continued treatment against her wishes through false pretenses and undue pressure.

45. Defendants' actions in administering excessive doses of morphine and midazolam for the purpose of artificially suppressing Ms. Brown's respiratory efforts and hastening her death, despite her proxies' objections, shocks the conscience in a constitutional sense. (County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) ("To this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience. Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."))

46. Defendants' conduct in intentionally disregarding Ms. Brown's advance directives, overriding the decisions of her legal proxies, and subjecting her to an inhumane and agonizing death by suffocation evinced a conscious disregard of a great risk of serious harm and deliberate indifference to her constitutional rights. (Pena v. DePrisco, 432 F.3d 98, 112 (2d Cir. 2005)

("Deliberate indifference requires that the defendant knew of and disregarded an excessive risk to the victim's health or safety."))

47. As a direct and proximate result of Defendants' violations of Ms. Brown's constitutional rights as described above, she suffered severe pain, emotional distress, violation of her dignity and bodily autonomy, and ultimately a prolonged and agonizing death by suffocation.

**COUNT II: 42 U.S.C. § 1983 - Fourteenth Amendment Equal Protection**
**(All Plaintiffs against Buffalo General, Kaleida, Dr. Campbell, Nurses, Staff)**

48. Plaintiffs reallege and incorporate the preceding paragraphs as if fully restated herein.

49. Defendants' actions in disregarding Ms. Brown's advance directives, overriding her proxies' decisions, and intentionally hastening her death through the administration of excessive morphine and midazolam were motivated at least in part by racial animus and discrimination against Ms. Brown as an African American woman.

50. Defendants subjected Ms. Brown's family members to a hostile environment through the repeated calling of security, intimidation tactics, and dismissive treatment when they attempted to advocate for Ms. Brown's rights and expressed treatment preferences as her legal proxies. (See Hawkins v. Nassau Cnty. Corr. Facility, 781 F. Supp. 2d 107, 115 (E.D.N.Y. 2011) (recognizing hostile environment claims based on race in non-employment contexts))

51. Defendants provided Ms. Brown and her family members inferior medical care, failed to respect Ms. Brown's autonomy and right to refuse treatment, and ultimately caused her severe pain and suffering culminating in a cruel and dehumanizing death, because of her race. (See Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005) (allowing equal protection claim based on racially discriminatory provision of medical care))

52. Defendants' conduct deprived Ms. Brown of the equal protection of the laws secured by the Fourteenth Amendment through racial discrimination in a federally funded program or activity. (42 U.S.C. § 2000d; Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 584 (1983) ("We conclude, therefore, that Title VI proscribes only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment."))

53. As a direct result of Defendants' intentional racial discrimination, Ms. Brown suffered violations of her constitutional rights, severe pain and suffering, emotional distress, loss of

dignity, and death. (See Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001) (discussing compensatory damages for equal protection violations))

**COUNT III: 42 U.S.C. § 1983 - First Amendment Retaliation**
**(Plaintiffs against Buffalo General, Kaleida, Dr. Campbell, Nurses, Staff)**

54. Plaintiffs reallege and incorporate the preceding paragraphs as if fully restated herein.
55. Plaintiffs engaged in constitutionally protected speech and conduct when they objected to the withdrawal of life-sustaining treatment from Ms. Brown against her wishes and when they questioned the appropriateness of the high-dose morphine being administered. (See Maloney v. Cuomo, 470 F. Supp. 2d 205, 213 (E.D.N.Y. 2007) (recognizing First Amendment right to advocate on issues of public concern))
56. Defendants retaliated against Plaintiffs by repeatedly calling security forces to intimidate, obstruct and restrict their ability to advocate for Ms. Brown's rights and medical treatment preferences as her legal healthcare proxies and family members. (See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 91 (2d Cir. 2002) (discussing elements of First Amendment retaliation claim))
57. Defendants took these adverse actions against Plaintiffs at least in part to retaliate against and deter them from persisting in their protected speech and conduct advocating for Ms. Brown's rights and opposing the actions taken to hasten her death against her wishes. (Id.)
58. Defendants' retaliatory actions violated Plaintiffs' rights under the First Amendment's Free Speech and Petition Clauses, as enforced through 42 U.S.C. § 1983. (Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("The right to petition government for redress of grievances is 'among the most precious of the liberties safeguarded by the Bill of Rights.'"))
59. As a direct result of Defendants' First Amendment retaliation, Plaintiffs suffered violations of their constitutional rights, emotional distress, and were obstructed from fully advocating for Ms. Brown's rights and preferences regarding her medical treatment. (See Gagliardi v. Village of Pawling, 18 F.3d 188, 194 (2d Cir. 1994) (discussing damages for First Amendment retaliation))

**COUNT IV: Wrongful Death - Medical Malpractice**
**(All Plaintiffs against Buffalo General, Kaleida, Dr. Campbell, Nurses, Staff)**

60. Plaintiffs reallege and incorporate the preceding paragraphs as if fully restated herein.

61. Defendants Buffalo General Hospital, Kaleida Health, Dr. Campbell, Nurses, and Staff owed duties to Ms. Brown to possess the requisite knowledge and skill competent in their respective medical professions, to exercise reasonable care in administering treatment, and to obtain informed consent for medical interventions. (Topel v. Long Is. Jewish Med. Ctr., 55 N.Y.2d 682 (1981) ("The requisite elements of proof in a medical malpractice action are a deviation or departure from accepted community standards of practice and evidence that such deviation or departure was a proximate cause of injury or damage."))

62. As a direct result of Defendants' intentional or reckless actions creating a grave risk of death, Ms. Brown suffered an agonizing death, and Plaintiffs have suffered severe emotional distress, loss of companionship, and other damages. (See Public Health Law § 4900 et seq. (providing for recovery of damages in wrongful death actions)). Defendants breached these duties through their actions and failures, including but not limited to:

- Administering excessive and inappropriate doses of morphine and midazolam against Ms. Brown's wishes, directly contributing to her death (see Boyle v. State, 146 A.D.3d 1442 (4th Dep't 2017) (finding potential liability for overmedication causing death))
- Failing to provide necessary respiratory support and treatment despite Ms. Brown's visible distress (Topel v. Long Is. Jewish Med. Ctr., 55 N.Y.2d 682, 685 (1981) ("a physician may be liable for leaving 'the course of treatment' before the patient's condition has stabilized"))
- Disregarding Ms. Brown's clearly expressed advance directives for continued life-sustaining care (N.Y. Pub. Health Law § 2994-a; Cruzan v. Director, MDH, 497 U.S. 261, 284 (1990) (recognizing right to refuse treatment))
- Unduly influencing and coercing Ms. Brown's healthcare proxies to revoke her treatment wishes against her known desires (Schloendorff v. Society of N.Y. Hospital, 211 N.Y. 125 (1914) (duty to obtain informed consent))

63. As a direct and proximate result of Defendants' breaches, Ms. Brown suffered:

- Pain and suffering due to respiratory suppression (see Boyle, 146 A.D.3d at 1445 (allowing damages for "predeath pain and suffering"))

- Severe emotional distress and violation of dignity in her final hours (Khoury v. Kolb, 135 A.D.2d 1025, 1026 (3d Dep't 1987) (emotional distress damages available in medical malpractice))
- A shortened life expectancy
- Wrongful death (N.Y. Est. Powers & Trusts Law § 5-4.1 (defining wrongful death))

64. Plaintiffs have suffered damages including:

- Emotional distress from witnessing Ms. Brown's inhumane treatment (Trombetta v. Conkling, 82 N.Y.2d 549, 554 (1993) (allowing bystander emotional distress claims))
- Loss of companionship and guidance (N.Y. Est. Powers & Trusts Law § 5-4.3 (allowing damages for loss of parental guidance))
- Economic damages including medical expenses and funeral costs (Id. at § 5-4.3(a))

**COUNT V: Intentional Infliction of Emotional Distress**
**(All Plaintiffs against All Defendants)**

65. Plaintiffs reallege and incorporate the preceding paragraphs.

66. Defendants' conduct in intentionally disregarding Ms. Brown's known treatment preferences, coercing her proxies, and administering high doses of medication to hasten her death against her wishes constitutes extreme and outrageous conduct beyond the bounds of human decency. (See Howell v. New York Post Co., 81 N.Y.2d 115, 122 (1993) (defining extreme and outrageous conduct as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community"))

67. Defendants acted intentionally or with reckless disregard, knowing their actions would cause severe emotional distress to Ms. Brown and her family members. (Id. (requiring intent or reckless disregard and causation of severe emotional distress))

68. As a direct result, Ms. Brown suffered severe emotional trauma in her final hours, and Plaintiffs have suffered severe emotional distress, mental anguish, and psychological harm from witnessing the inhumane treatment of their loved one. (See Trombetta, 82 N.Y.2d at 554 (allowing bystander claims for immediate family members who witness serious injury or death caused by defendant's extreme and outrageous conduct))

**COUNT VI: Battery**

**(All Plaintiffs against Buffalo General, Kaleida, Dr. Campbell, Nurses, Staff)**

69. Plaintiffs reallege and incorporate the preceding paragraphs as if fully restated herein.
70. Defendants intentionally administered excessive doses of morphine and midazolam to Ms. Brown against her express wishes, causing her severe pain, suffering and ultimately death. (See Schloendorff, 211 N.Y. at 129-30 (unconsented medical treatment is a battery))
71. Defendants further committed a battery by withdrawing Ms. Brown's life-sustaining treatment through the removal of her CPAP/BiPAP mask and feeding tube, despite her instructions to receive all such care. (Id.)
72. Neither Ms. Brown nor her authorized healthcare proxies provided legal consent for these invasive medical acts that violated her bodily integrity. (Id.)
73. Defendants' conduct constituted unlawful, offensive, and unpermitted touchings and contacts upon Ms. Brown's person. (Id.)

**COUNT VII: Breach of Fiduciary Duty**

**(All Plaintiffs against Buffalo General, Kaleida, Dr. Campbell, Nurses, Staff)**

74. Plaintiffs reallege and incorporate the preceding paragraphs.
75. As Ms. Brown's healthcare providers, Defendants owed her a fiduciary duty to act solely in her best interests regarding medical decisions. (Flanagan v. Munroe, 75 N.Y.2d 698, 703 (1990) ("The physician-patient relationship thus operates and flourishes in an atmosphere of transcendent trust and confidence and is infused with fiduciary obligations."))
76. Defendants breached this duty by coercing Ms. Brown's court-appointed healthcare proxies to revoke her advance directive for continued treatment against her known wishes. (Id.)
77. Defendants further breached their duty by administering excessive medication to hasten Ms. Brown's death over her objections and against the decisions of her legal proxies. (Id.)
78. Defendants' conduct constituted a willful violation of their fiduciary obligations to Ms. Brown. (See Pacio v. Franklin Hosp., 63 A.D.3d 1644, 1646 (4th Dep't 2009) (allowing claim for breach of fiduciary duty against hospital))

**COUNT VIII: Fraud/Misrepresentation**

**(All Plaintiffs against Buffalo General, Kaleida, Dr. Campbell, Nurses, Staff)**

79. Plaintiffs reallege and incorporate the preceding paragraphs.

80. Defendants made false representations to Ms. Brown's healthcare proxies that she had only days left to live in order to pressure them into signing the DNR order. (See Vermeer Owners v. Guterman, 78 N.Y.2d 1114, 1116 (1991) (defining fraudulent misrepresentation))

81. Defendants knew these representations were false when made, or made them recklessly without knowing their truth. (Id.)

82. Ms. Brown's proxies justifiably relied on these misrepresentations in revoking her advance directive against her wishes. (Id.)

83. Defendants' fraudulent conduct directly caused Ms. Brown's death through the premature withdrawal of life support. (See Litras v. Litras, 254 A.D.2d 395, 396 (2d Dep't 1998) (allowing fraud claim based on misrepresentations inducing detrimental reliance))

**COUNT IX: Violation of 42 U.S.C. § 1983 - Fourteenth Amendment**

**(All Plaintiffs against Buffalo General, Kaleida, Dr. Campbell, Nurses, Staff)**

84. Plaintiffs reallege and incorporate the preceding paragraphs.

85. At all relevant times, Defendants were acting under color of state law in their respective roles as a state-regulated hospital and healthcare providers. (See Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982) (defining "under color of state law" as the exercise of power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law"))

86. Defendants, while acting under color of state law, deprived Ms. Brown of rights secured by the Fourteenth Amendment, including her substantive due process right to refuse unwanted medical treatment. (Cruzan, 497 U.S. at 278; Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (assuming a liberty interest in refusing unwanted medical treatment))

87. Defendants deliberately disregarded Ms. Brown's clearly expressed treatment preferences through improper withdrawal of life support and administration of excessive medication to hasten her death. (County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998))
88. Defendants' conduct in intentionally overriding Ms. Brown's advance directives and the decisions of her legal proxies shocks the conscience. (Id.)
89. As a direct result, Ms. Brown suffered severe pain, emotional trauma, loss of dignity and life in violation of her constitutional rights. (See Pena v. DePrisco, 432 F.3d 98, 112 (2d Cir. 2005))

**COUNT X: Violation of 42 U.S.C. § 1983 - Fourteenth Amendment Equal Protection (All Plaintiffs against Buffalo General, Kaleida, Dr. Campbell, Nurses, Staff)**

90. Plaintiffs reallege and incorporate the preceding paragraphs.
91. Defendants' actions in disregarding Ms. Brown's directives, overriding her proxies' decisions, and intentionally hastening her death were motivated by racial animus against Ms. Brown as an African American woman. (See Village of Arlington Heights v. Metro Housing Dev. Corp., 429 U.S. 252, 265-66 (1977) (discussing factors probative of racially discriminatory intent))
92. Defendants subjected Ms. Brown and her family to a hostile environment through intimidation tactics like repeatedly calling security when they advocated for Ms. Brown's rights. (See Hawkins v. Nassau Cnty. Corr. Facility, 781 F. Supp. 2d 107, 115 (E.D.N.Y. 2011) (recognizing hostile environment claims based on race in non-employment contexts))
93. Defendants provided Ms. Brown and her family inferior medical care, failed to respect her autonomy, and ultimately caused her severe suffering culminating in a cruel death, because of her race. (See Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005) (allowing equal protection claim based on racially discriminatory provision of medical care))
94. This conduct deprived Ms. Brown of equal protection of the laws through racial discrimination by state actors in a federally funded healthcare program. (42 U.S.C. § 2000d; Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 584 (1983))

**COUNT XI: Violation of New York Patient Self-Determination Act (All Plaintiffs against Buffalo General, Kaleida, Dr. Campbell, Nurses, Staff)**

95. Plaintiffs reallege and incorporate the preceding paragraphs.
96. New York's Public Health Law Article 29-C codifies the rights of patients to control decisions about their own health care through advance directives like Ms. Brown's. (N.Y. Pub. Health Law §§ 2994-a to 2994-u)
97. Defendants violated Ms. Brown's statutory rights by disregarding her clearly expressed directive for life-sustaining treatment and coercing her proxies to revoke it against her wishes. (Id. at § 2994-d(4)(a)(ii) (prohibiting providers from unduly influencing healthcare agent's decisions))
98. Defendants' conduct was intentional and evidenced a conscious disregard for Ms. Brown's legal rights under the Act. (See Pacio, 63 A.D.3d at 1646)

**COUNT XII: Wrongful Death - Negligence**
**(All Plaintiffs against Hospira and Pfizer)**

99. Plaintiffs reallege and incorporate the preceding paragraphs.
100. Defendants Hospira and Pfizer had a duty to provide adequate warnings regarding the risks and dangers of improperly administering midazolam, a drug they manufactured. (Martin v. Hacker, 83 N.Y.2d 1, 9 (1993))
101. Hospira and Pfizer breached this duty by failing to warn that high doses of midazolam, especially when combined with opioids like morphine, create severe risks of respiratory depression and death. (Id.)
102. Hospira and Pfizer's failure to provide such warnings was a proximate cause of Ms. Brown receiving excessive midazolam and morphine, which directly contributed to her suffering and wrongful death. (Id.)
103. As a result, Plaintiffs suffered damages including medical expenses, funeral costs, Ms. Brown's pre-death pain and suffering, and loss of companionship. (N.Y. Est. Powers & Trusts Law §§ 5-4.1, 5-4.3)

**COUNT XIII: Strict Products Liability**
**(All Plaintiffs against Hospira and Pfizer)**

104. Plaintiffs reallege and incorporate the preceding paragraphs as if fully restated herein.

105. At all relevant times, Defendants Hospira and Pfizer were engaged in the business of manufacturing, distributing, and selling the drugs midazolam and morphine.

106. These drugs were expected to and did reach Plaintiffs and Ms. Brown without substantial change in the condition in which they were manufactured and sold.

107. The combination of midazolam and morphine used on Ms. Brown was defective and unreasonably dangerous when put to their reasonably anticipated use of rendering a patient unconscious and insensate to pain prior to death. (Voss v. Black & Decker Mfg. Co., 59 N.Y.2d 102, 107 (1983))

108. This defective and unreasonably dangerous condition existed at the time the drugs were manufactured and sold by Hospira and Pfizer. (Id.)

109. This defect was the proximate cause of Ms. Brown's severe pain, suffering, and ultimate death by suffocation. (Codling v. Paglia, 32 N.Y.2d 330, 342 (1973))

110. Defendants Hospira and Pfizer are strictly liable for the harm caused by their defective products. (N.Y. Pattern Jury Instr.--Civil 2:120)

**COUNT XIV: Negligence**

**(All Plaintiffs against Hospira and Pfizer)**

111. Plaintiffs reallege and incorporate the preceding paragraphs.

112. Defendants Hospira and Pfizer had a duty to exercise reasonable care in the manufacture, distribution, sale, and provision of adequate warnings for the drugs midazolam and morphine. (Martin v. Hacker, 83 N.Y.2d 1, 9 (1993))

113. Defendants breached this duty of care by:

a) Failing to adequately warn of the risks that high doses of midazolam, especially when combined with opioids like morphine, could fail to render an individual insensate and cause severe pain and suffering (see Cooley v. Carter-Wallace Inc., 102 A.D.2d 642, 644 (4th Dep't 1984) (discussing duty to warn of risks));

b) Negligently manufacturing products that were unsafe and ineffective for inducing and maintaining a coma-like unconsciousness prior to death (see Enright v. Eli Lilly & Co., 77 N.Y.2d 377, 387 (1991) (discussing negligent manufacturing claims));

c) Failing to provide sufficient instructions or guidelines for the intended off-label use of their products in end-of-life care protocols involving excessive dosing (see Wolfgruber v. Upjohn Co., 72 A.D.2d 59, 62 (4th Dep't 1979) (discussing duty to provide adequate instructions)).

114. As a direct and proximate result of Defendants' negligence, Ms. Brown experienced an agonizing and tortuous death in violation of her constitutional rights. (Ingersoll v. Liberty Bank of Buffalo, 278 N.Y. 167, 169-70 (1938))

115. Plaintiffs suffered severe emotional distress, mental anguish, and other damages from witnessing the inhumane treatment of their loved one. (Kennedy v. McKesson Co., 58 N.Y.2d 500, 504 (1983))

**COUNT XV: Fraudulent Misrepresentation/Concealment**
**(All Plaintiffs against Hospira and Pfizer)**

116. Plaintiffs reallege and incorporate the preceding paragraphs.

117. Defendants Hospira and Pfizer had a duty to exercise reasonable care to disclose the truth about the risks and limitations of their products midazolam and morphine when used in excessive doses for end-of-life care protocols. (Goldes v. Conway Corp., 292 A.D.2d 577, 579 (2d Dep't 2002))

118. Defendants negligently or intentionally concealed and/or misrepresented material facts about whether midazolam and morphine could reliably and humanely induce a coma-like unconsciousness and insensitivity to severe pain when used in the doses and combination administered to Ms. Brown. (Dembeck v. 220 E. 50th Owners, Inc., 155 A.D.3d 500, 501 (1st Dep't 2017)); medical experts have testified that midazolam doses as low as 0.04-0.07mg/kg can cause death. (See Glossip, 576 U.S. at 949 (Sotomayor, J., dissenting) (citing testimony of Dr. Evans))

119. Defendants knew or should have known these representations were false and they intentionally or recklessly failed to disclose the risks. (Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y.2d 403, 407 (1958))

120. Defendants intended that healthcare providers like Buffalo General Hospital would rely on their misrepresentations and omissions in adopting the midazolam/morphine protocol used on Ms. Brown. (Navarra v. Marlborough Gallery, 300 A.D.2d 241, 242 (1st Dep't 2002))

121. Buffalo General Hospital did reasonably rely on Defendants' misrepresentations and omissions to their detriment. (P.T. & L. Constr. Co. v. Madigan & Hyland, 245 A.D.2d 501, 502 (2d Dep't 1997))
122. As a direct result of this fraudulent conduct, Ms. Brown suffered severe pain, emotional trauma, loss of dignity and life itself through an agonizing death that violated her constitutional rights. (Kregos v. Associated Press, 3 F.3d 656, 665 (2d Cir. 1993))
123. Plaintiffs have suffered substantial damages including emotional distress, loss of companionship, and other injuries. (Cooley, 102 A.D.2d at 644)

**COUNT XVI: Breach of Implied Warranty**
**(All Plaintiffs against Hospira and Pfizer)**

124. Plaintiffs reallege and incorporate the preceding paragraphs.
125. At the time Hospira and Pfizer manufactured and sold midazolam and morphine, they knew the particular purpose for which the drugs would be used on Ms. Brown, i.e. to induce a coma-like unconsciousness and insensitivity to pain prior to death. (Randy Knitwear, Inc. v. American Cyanamid Co., 11 N.Y.2d 5, 13 (1962))
126. By placing these drugs into the stream of commerce for that particular purpose, Hospira and Pfizer impliedly warranted that the products were merchantable and fit for that intended use. (Id.)
127. The drugs were defective, unmerchantable, and unfit for their intended use, in that they failed to reliably render Ms. Brown unconscious and insensate to the severe pain and suffering she experienced. (Doulton Piston Ring Co. v. Jeffries-Zitrin Valve & Gasket Co., 286 A.D. 363, 365 (1st Dep't 1955)). Defendants breached this duty of care by: a) Failing to recall, label and adequately warn of the risks that midazolam, especially when combined with opioids like morphine, could cause significant respiratory depression and airway obstruction in patients with pulmonary disease (Farag E, Argalious M. Anesthesia for Organ Transplantation. In: Gropper MA, ed. Miller's Anesthesia. 9th ed. Elsevier; 2020:2088-2117 ("The combination of benzodiazepines and opioids can cause significant respiratory depression and airway obstruction, especially in patients with pulmonary disease."))

128. As a direct and proximate result of this breach of the implied warranty of merchantability and fitness for a particular purpose, Ms. Brown suffered severe pain, trauma, loss of dignity, and death. (Ingersoll, 278 N.Y. at 169-70)

**COUNT XVII: Wrongful Death - Survival Action**
**(All Plaintiffs against All Defendants)**

129. Plaintiffs reallege and incorporate the preceding paragraphs.
130. The acts and omissions of Defendants, as described above, caused Ms. Brown's death through fundamentally inhumane means that violated her constitutional rights.
131. Prior to her death, Ms. Brown experienced severe physical and emotional pain and suffering as a result of Defendants' tortious acts.
132. Pursuant to N.Y. Est. Powers & Trusts Law § 11-3.2, Plaintiffs bring this survival action, in their capacity as administrators of Ms. Brown's estate, to recover for the pain, suffering and constitutional violations she experienced prior to her death.
133. Plaintiffs are entitled to damages including but not limited to: pain and suffering, emotional distress, loss of dignity, and other compensatory damages for the constitutional injuries sustained by Ms. Brown prior to her death. (Ratka v. St. Francis Hosp., 44 N.Y.2d 604, 609 (1978))

**COUNT XVIII: Negligence Per Se - Nurses Overriding Software**
**(All Plaintiffs against Buffalo General, Nurses)**

134. Plaintiffs reallege and incorporate the preceding paragraphs.
135. New York's Public Health Law and regulations promulgated thereunder establish the standard of care for administering medication in a hospital setting. (Yerich v. State, 43 A.D.3d 1413, 1415 (4th Dep't 2007))
136. These laws and regulations prohibit nurses from overriding software safeguards and administering excessive doses of controlled substances like morphine without proper medical justification. (See 10 NYCRR § 80.65 (prohibiting administration of controlled substances except as authorized by law); 10 NYCRR § 405.10 (requiring hospitals to establish policies and procedures for safe administration of drugs))

137. Defendants Jane Doe Nurses 1 and 2 violated these statutes, codes and regulations by intentionally overriding the hospital's medication software system in order to administer lethal doses of morphine to Ms. Brown against her wishes. (Yerich, 43 A.D.3d at 1415)

138. This violation of the statutory standard of care constitutes negligence per se. (Elliott v. City of New York, 95 N.Y.2d 588, 595 (2001))

139. As a direct result of this negligence per se, Ms. Brown suffered severe pain and suffering, emotional trauma, loss of dignity, and ultimately a premature and agonizing death in violation of her constitutional rights. (Ingersoll v. Liberty Bank of Buffalo, 278 N.Y. 167, 169-70 (1938))

**COUNT XIX: Civil Conspiracy**
**(All Plaintiffs against All Defendants)**

140. Plaintiffs reallege and incorporate the preceding paragraphs as if fully restated herein.

141. Defendants knowingly and willfully conspired, agreed, and acted in concert to violate Ms. Brown's constitutional rights by improperly withdrawing life support, administering excessive medication to hasten her death, and depriving her of her right to refuse unwanted medical treatment.

142. In furtherance of this conspiracy, Defendants committed multiple overt acts, including but not limited to:

a) Misleading Ms. Brown's healthcare proxies to obtain the DNR order against her wishes;

b) Calling security and taking hostile actions to intimidate Ms. Brown's family advocates;

c) Administering high doses of morphine and midazolam despite objections;

d) Failing to provide respiratory support and treatment as Ms. Brown suffered respiratory distress.

143. As a direct and proximate result of Defendants' conspiracy, Ms. Brown suffered violations of her constitutional rights, severe pain and suffering, emotional trauma, loss of dignity, and ultimately a cruel and premature death. (Rastelli v. Goodyear Tire & Rubber Co., 79 N.Y.2d 289, 295 (1992) (recognizing civil conspiracy claim where defendants agreed to participate in unlawful act and committed overt acts causing injury))

**COUNT XX: Concert of Action**

**(All Plaintiffs against All Defendants)**

144. Plaintiffs reallege and incorporate the preceding paragraphs.

145. In the alternative, Defendants acted in concert, jointly participating in a course of action to deprive Ms. Brown of her constitutional rights through their collective actions withdrawing life support and administering excessive medication against her wishes.

146. Each Defendant assisted, encouraged, and rendered substantial assistance to the others in this course of conduct through acts including but not limited to those outlined in paragraph 142 above.

147. As a direct and proximate result of this concerted conduct, Ms. Brown suffered violations of her constitutional rights, pain, emotional trauma, loss of dignity and life itself. (Rastelli, 79 N.Y.2d at 295 (allowing concert of action claim where defendants jointly participated in tortious conduct))

**COUNT XXI: Loss of Consortium**
**(Plaintiffs against All Defendants)**

148. Plaintiffs reallege and incorporate the preceding paragraphs.

149. Plaintiffs are the sisters and nephew of the deceased Ms. Brown.

150. As a direct result of Defendants' wrongful conduct causing Ms. Brown's premature death, Plaintiffs suffered permanent loss of Ms. Brown's companionship, society, advice, guidance and services.

151. Plaintiffs are entitled to damages for this loss under New York's wrongful death statute. (N.Y. Est. Powers & Trusts Law § 5-4.3 (allowing recovery for loss of consortium in wrongful death action))

**COUNT XXII: Negligent Infliction of Emotional Distress**
**(All Plaintiffs against All Defendants)**

152. Plaintiffs reallege and incorporate the preceding paragraphs.

153. Defendants engaged in conduct involving an unreasonable risk of causing emotional distress to Plaintiffs by:

a) Improperly withdrawing life support from Ms. Brown against her wishes

b) Administering high doses of medication to hasten Ms. Brown's death

c) Calling security and taking hostile actions to intimidate Plaintiffs advocating for Ms. Brown

154. It was reasonably foreseeable that such conduct would cause severe emotional distress to Plaintiffs, Ms. Brown's closest family members. (Kennedy v. McKesson Co., 58 N.Y.2d 500, 504 (1983) (allowing negligent infliction of emotional distress claim where defendant's conduct created unreasonable risk of bodily harm to plaintiff's immediate family member))

155. Plaintiffs suffered severe emotional distress, mental anguish and psychological trauma from witnessing the inhumane treatment of their loved one in her final hours. (Id.)

**COUNT XXIII: Violation of New York Consumer Protection Law**

**(All Plaintiffs against Hospira and Pfizer)**

156. Plaintiffs reallege and incorporate the preceding paragraphs.

157. Defendants Hospira and Pfizer engaged in deceptive acts and practices in the conduct of business, trade, and commerce by:

a) Failing to warn of risks that their drug midazolam could not reliably render patients insensate when used in lethal doses with other medications

b) Misrepresenting the safety and efficacy of midazolam for use in lethal injection executions

c) Concealing material information about midazolam's limitations and ceiling effect

158. Such conduct violated New York's consumer protection statutes, including N.Y. Gen. Bus. Law § 349 (prohibiting deceptive acts and practices). (Goshen v. Mutual Life Ins. Co., 98 N.Y.2d 314, 324 (2002) (defining deceptive acts under § 349 as those likely to mislead reasonable consumer))

159. As a direct result, Ms. Brown suffered severe pain, trauma and ultimately death from the inappropriate administration of midazolam.

**COUNT XXIV: Public Nuisance**

**(All Plaintiffs against All Defendants)**

160. Plaintiffs reallege and incorporate the preceding paragraphs.

161. Defendants' conduct in improperly withdrawing life support, administering excessive medication, and hastening Ms. Brown's death through inhumane means constituted an unreasonable interference with rights common to the general public, including:

a) The public right to expect licensed medical providers will not intentionally cause patient suffering and death

b) The public's interest in the ethical and lawful provision of medical services

162. This conduct was intentional, unreasonable, unlawful, and caused severe harm affecting the community's public rights. (532 Madison Ave. Gourmet Foods v. Finlandia Ctr., 96 N.Y.2d 280, 292 (2001) (defining public nuisance as substantial interference with public right))

163. As a direct result of this public nuisance, Ms. Brown and her family suffered special injuries distinct from the general public. (Id. (requiring special injury for private plaintiff to have standing))

**COUNT XXV: Intentional Misrepresentation/Fraud**

**(All Plaintiffs against Buffalo General, Kaleida, Dr. Campbell, Nurses, Staff)**

164. Plaintiffs reallege and incorporate the preceding paragraphs.

165. Defendants made false representations to Ms. Brown's healthcare proxies that she had only days left to live in order to pressure them into signing the DNR order.

166. Defendants knew these representations were false when made, or made them recklessly without knowing their truth. (Channel Master Corp. v. Aluminum Ltd. Sales, 4 N.Y.2d 403, 407 (1958) (defining scienter element of fraud))

167. Ms. Brown's proxies justifiably relied on these misrepresentations in revoking her advance directive against her wishes.

168. Defendants' fraudulent conduct directly caused Ms. Brown's death through the premature withdrawal of life support. (Litras v. Litras, 254 A.D.2d 395, 396 (2d Dep't 1998) (allowing fraud claim based on misrepresentations inducing detrimental reliance))

**COUNT XXVI: Vicarious Liability/Respondeat Superior**

**(All Plaintiffs against Buffalo General and Kaleida)**

169. Plaintiffs reallege and incorporate the preceding paragraphs.

170. At all relevant times, Defendants Dr. Campbell, Nurses, and Staff were acting within the course and scope of their employment or agency relationship with Buffalo General Hospital and Kaleida Health System.

171. Under the doctrine of respondeat superior, Buffalo General and Kaleida are vicariously liable for the tortious acts and omissions of their employees and agents, including but not limited to the violations of Ms. Brown's constitutional rights, medical negligence, battery, fraud, and other misconduct described herein. (Judith M. v. Sisters of Charity Hosp., 93 N.Y.2d 932, 933 (1999) (holding hospital vicariously liable for torts committed by employee nurse within scope of employment))

**COUNT XXVII: Defamation**

**(Plaintiffs against Buffalo General, Kaleida, Dr. Campbell, Nurses, Staff)**

172. Plaintiffs reallege and incorporate the preceding paragraphs.

173. Defendants made false and defamatory statements of fact by accusing Plaintiff New of improperly recording hospital staff without permission when they were lawfully recording evidence of the improper treatment of Ms. Brown. As Ms. Brown lay unconscious and experiencing agonal breathing, a sign of impending respiratory arrest and death, due to the excessive doses of intravenous morphine being administered by nurses every 15 minutes despite the family's desperate objections, hospital staff threatened to and did call hospital security on Plaintiffs.

174. These statements tended to injure Plaintiffs' reputations and exposed them to public hatred, contempt, ridicule, and disgrace. (Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 177 (2d Cir. 2000) (defining defamatory statement as one that "tends to injure another's reputation or good name" by exposing them to "public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace"))

175. Defendants acted with actual malice and reckless disregard for the truth. (Id. at 179-80 (explaining that for public figures, defamation requires showing of actual malice, defined as knowledge of falsity or reckless disregard for the truth))

176. As a direct result, Plaintiffs suffered damages including emotional distress, injury to their reputations, and other compensable harm. (Liberman v. Gelstein, 80 N.Y.2d 429, 435 (1992) (listing compensable damages for defamation))

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1) Award general and compensatory damages to Plaintiffs in an amount to be proven at trial;

2) Award punitive damages against Defendants in an amount to deter such future misconduct;

3) Award Plaintiffs their reasonable attorneys' fees, costs, and expenses;

4) Order appropriate equitable relief, including but not limited to:

   a) Disciplinary action against the individual medical professionals involved;

   b) Remedial training at Buffalo General Hospital;

   c) Oversight and monitoring of the hospital's policies and practices;

   d) Recall and re-labeling of Hospira and Pfizer's midazolam and morphine products;

5) Award prejudgment and postjudgment interest as permitted by law;

6) Empanel an advisory jury to consider the imposition of punitive damages; and

7) Grant any other relief this Court deems just and proper.

8) Order expedited discovery to preserve critical evidence and witness testimony related to the improper treatment and untimely death of Monique Brown, as memories may fade and records could be lost if not promptly secured. (See Fed. R. Civ. P. 26(d)(1) (allowing court to order discovery before parties' Rule 26(f) conference); Fed. R. Civ. P. 34(b)(2)(A) (requiring production of documents within 30 days after being served with request); Topo v. Dhir, 210 F.R.D. 76, 78 (S.D.N.Y. 2002) (granting expedited discovery "to obtain information that may later become unavailable")).

Dated: August 2, 2024

Respectfully submitted,

/S/ Juanice Rene Collins-New

/S/ Isaiah Thomas New

Juanice Rene Collins-New

Isaiah Thomas New

P.O. Box 209

Buffalo, NY 14215

estateofmoniquebrown@gmail.com

Plaintiffs Pro Se

# Exhibit A

# HEALTH CARE PROXY

## Appointing Your Health Care Agent in New York State

The New York Health Care Proxy Law allows you to appoint someone you trust — for example, a family member or close friend – to make health care decisions for you if you lose the ability to make decisions yourself. By appointing a health care agent, you can make sure that health care providers follow your wishes. Your agent can also decide how your wishes apply as your medical condition changes. Hospitals, doctors and other health care providers must follow your agent's decisions as if they were your own. You may give the person you select as your health care agent as little or as much authority as you want. You may allow your agent to make all health care decisions or only certain ones. You may also give your agent instructions that he or she has to follow. This form can also be used to document your wishes or instructions with regard to organ and/or tissue donation.

## About the Health Care Proxy Form

**This is an important legal document. Before signing, you should understand the following facts:**

1. This form gives the person you choose as your agent the authority to make all health care decisions for you, including the decision to remove or provide life-sustaining treatment, unless you say otherwise in this form. "Health care" means any treatment, service or procedure to diagnose or treat your physical or mental condition.
2. Unless your agent reasonably knows your wishes about artificial nutrition and hydration (nourishment and water provided by a feeding tube or intravenous line), he or she will not be allowed to refuse or consent to those measures for you.
3. Your agent will start making decisions for you when your doctor determines that you are not able to make health care decisions for yourself.
4. You may write on this form examples of the types of treatments that you would not desire and/or those treatments that you want to make sure you receive. The instructions may be used to limit the decision-making power of the agent. Your agent must follow your instructions when making decisions for you.
5. You do not need a lawyer to fill out this form.
6. You may choose any adult (18 years of age or older), including a family member or close friend, to be your agent. If you select a doctor as your agent, he or she will have to choose between acting as your agent or as your attending doctor because a doctor cannot do both at the same time. Also, if you are a patient or resident of a hospital, nursing home or mental hygiene facility, there are special restrictions about naming someone who works for that facility as your agent. Ask staff at the facility to explain those restrictions.
7. Before appointing someone as your health care agent, discuss it with him or her to make sure that he or she is willing to act as your agent. Tell the person you choose that he or she will be your health care agent. Discuss your health care wishes and this form with your agent. Be sure to give him or her a signed copy. Your agent cannot be sued for health care decisions made in good faith.
8. If you have named your spouse as your health care agent and you later become divorced or legally separated, your former spouse can no longer be your agent by law, unless you state otherwise. If you would like your former spouse to remain your agent, you may note this on your current form and date it or complete a new form naming your former spouse.
9. Even though you have signed this form, you have the right to make health care decisions for yourself as long as you are able to do so, and treatment cannot be given to you or stopped if you object, nor will your agent have any power to object.
10. You may cancel the authority given to your agent by telling him or her or your health care provider orally or in writing.
11. Appointing a health care agent is voluntary. No one can require you to appoint one.
12. You may express your wishes or instructions regarding organ and/or tissue donation on this form.

## Frequently Asked Questions

**Why should I choose a health care agent?**
If you become unable, even temporarily, to make health care decisions, someone else must decide for you. Health care providers often look to family members for guidance. Family members may express what they think your wishes are related to a particular treatment. Appointing an agent lets you control your medical treatment by:

- allowing your agent to make health care decisions on your behalf as you would want them decided;
- choosing one person to make health care decisions because you think that person would make the best decisions;
- choosing one person to avoid conflict or confusion among family members and/or significant others.

You may also appoint an alternate agent to take over if your first choice cannot make decisions for you.

**Who can be a health care agent?**
Anyone 18 years of age or older can be a health care agent. The person you are appointing as your agent or your alternate agent cannot sign as a witness on your Health Care Proxy form.

**How do I appoint a health care agent?**
All competent adults, 18 years of age or older, can appoint a health care agent by signing a form called a Health Care Proxy. You don't need a lawyer or a notary, just two adult witnesses. Your agent cannot sign as a witness. You can use the form printed here, but you don't have to use this form.

**When would my health care agent begin to make health care decisions for me?**
Your health care agent would begin to make health care decisions after your doctor decides that you are not able to make your own health care decisions. As long as you are able to make health care decisions for yourself, you will have the right to do so.

**What decisions can my health care agent make?**
Unless you limit your health care agent's authority, your agent will be able to make any health care decision that you could have made if you were able to decide for yourself. Your agent can agree that you should receive treatment, choose among different treatments and decide that treatments should not be provided, in accordance with your wishes and interests. However, your agent can only make decisions about artificial nutrition and hydration (nourishment and water provided by feeding tube or intravenous line) if he or she knows your wishes from what you have said or what you have written. The Health Care Proxy form does not give your agent the power to make non-health care decisions for you, such as financial decisions.

**Why do I need to appoint a health care agent if I'm young and healthy?**
Appointing a health care agent is a good idea even though you are not elderly or terminally ill. A health care agent can act on your behalf if you become even temporarily unable to make your own health care decisions (such as might occur if you are under general anesthesia or have become comatose because of an accident). When you again become able to make your own health care decisions, your health care agent will no longer be authorized to act.

**How will my health care agent make decisions?**
Your agent must follow your wishes, as well as your moral and religious beliefs. You may write instructions on your Health Care Proxy form or simply discuss them with your agent.

## Frequently Asked Questions, *continued*

**How will my health care agent know my wishes?**
Having an open and frank discussion about your wishes with your health care agent will put him or her in a better position to serve your interests. If your agent does not know your wishes or beliefs, your agent is legally required to act in your best interest. Because this is a major responsibility for the person you appoint as your health care agent, you should have a discussion with the person about what types of treatments you would or would not want under different types of circumstances, such as:

- whether you would want life support initiated/continued/removed if you are in a permanent coma;
- whether you would want treatments initiated/continued/removed if you have a terminal illness;
- whether you would want artificial nutrition and hydration initiated/withheld or continued or withdrawn and under what types of circumstances.

**Can my health care agent overrule my wishes or prior treatment instructions?**
No. Your agent is obligated to make decisions based on your wishes. If you clearly expressed particular wishes, or gave particular treatment instructions, your agent has a duty to follow those wishes or instructions unless he or she has a good faith basis for believing that your wishes changed or do not apply to the circumstances.

**Who will pay attention to my agent?**
All hospitals, nursing homes, doctors and other health care providers are legally required to provide your health care agent with the same information that would be provided to you and to honor the decisions by your agent as if they were made by you. If a hospital or nursing home objects to some treatment options (such as removing certain treatment) they must tell you or your agent BEFORE or upon admission, if reasonably possible.

**What if my health care agent is not available when decisions must be made?**
You may appoint an alternate agent to decide for you if your health care agent is unavailable, unable or unwilling to act when decisions must be made. Otherwise, health care providers will make health care decisions for you that follow instructions you gave while you were still able to do so. Any instructions that you write on your Health Care Proxy form will guide health care providers under these circumstances.

**What if I change my mind?**
It is easy to cancel your Health Care Proxy, to change the person you have chosen as your health care agent or to change any instructions or limitations you have included on the form. Simply fill out a new form. In addition, you may indicate that your Health Care Proxy expires on a specified date or if certain events occur. Otherwise, the Health Care Proxy will be valid indefinitely. If you choose your spouse as your health care agent or as your alternate, and you get divorced or legally separated, the appointment is automatically cancelled. However, if you would like your former spouse to remain your agent, you may note this on your current form and date it or complete a new form naming your former spouse.

**Can my health care agent be legally liable for decisions made on my behalf?**
No. Your health care agent will not be liable for health care decisions made in good faith on your behalf. Also, he or she cannot be held liable for costs of your care, just because he or she is your agent.

## Frequently Asked Questions, *continued*

**Is a Health Care Proxy the same as a living will?**
No. A living will is a document that provides specific instructions about health care decisions. You may put such instructions on your Health Care Proxy form. The Health Care Proxy allows you to choose someone you trust to make health care decisions on your behalf. Unlike a living will, a Health Care Proxy does not require that you decide in advance decisions that may arise. Instead, your health care agent can interpret your wishes as medical circumstances change and can make decisions you could not have known would have to be made.

**Where should I keep my Health Care Proxy form after it is signed?**
Give a copy to your agent, your doctor, your attorney and any other family members or close friends you want. Keep a copy in your wallet or purse or with other important papers, but not in a location where no one can access it, like a safe deposit box. Bring a copy if you are admitted to the hospital, even for minor surgery, or if you undergo outpatient surgery.

**May I use the Health Care Proxy form to express my wishes about organ and/or tissue donation?**
Yes. Use the optional organ and tissue donation section on the Health Care Proxy form and be sure to have the section witnessed by two people. You may specify that your organs and/or tissues be used for transplantation, research or educational purposes. Any limitation(s) associated with your wishes should be noted in this section of the proxy. **Failure to include your wishes and instructions on your Health Care Proxy form will not be taken to mean that you do not want to be an organ and/or tissue donor.**

**Can my health care agent make decisions for me about organ and/or tissue donation?**
Yes. As of August 26, 2009, your health care agent is authorized to make decisions after your death, but only those regarding organ and/or tissue donation. Your health care agent must make such decisions as noted on your Health Care Proxy form.

**Who can consent to a donation if I choose not to state my wishes at this time?**
It is important to note your wishes about organ and/or tissue donation to your health care agent, the person designated as your decedent's agent, if one has been appointed, and your family members. New York Law provides a list of individuals who are authorized to consent to organ and/or tissue donation on your behalf. They are listed in order of priority: your health care agent; your decedent's agent; your spouse, if you are not legally separated, or your domestic partner; a son or daughter 18 years of age or older; either of your parents; a brother or sister 18 years of age or older; a guardian appointed by a court prior to the donor's death; or another person authorized to dispose of the body.

# HEALTH CARE PROXY FORM INSTRUCTIONS

**Item (1)**
Write the name, home address and telephone number of the person you are selecting as your agent.

**Item (2)**
If you want to appoint an alternate agent, write the name, home address and telephone number of the person you are selecting as your alternate agent.

**Item (3)**
Your Health Care Proxy will remain valid indefinitely unless you set an expiration date or condition for its expiration. This section is optional and should be filled in only if you want your Health Care Proxy to expire.

**Item (4)**
If you have special instructions for your agent, write them here. Also, if you wish to limit your agent's authority in any way, you may say so here or discuss them with your health care agent. If you do not state any limitations, your agent will be allowed to make all health care decisions that you could have made, including the decision to consent to or refuse life-sustaining treatment.

If you want to give your agent broad authority, you may do so right on the form. Simply write: I have discussed my wishes with my health care agent and alternate and they know my wishes including those about artificial nutrition and hydration.

If you wish to make more specific instructions, you could say:

*If I become terminally ill, I do/don't want to receive the following types of treatments....*

*If I am in a coma or have little conscious understanding, with no hope of recovery, then I do/don't want the following types of treatments:....*

*If I have brain damage or a brain disease that makes me unable to recognize people or speak and there is no hope that my condition will improve, I do/don't want the following types of treatments:....*

*I have discussed with my agent my wishes about______________ and I want my agent to make all decisions about these measures.*

Examples of medical treatments about which you may wish to give your agent special instructions are listed below. This is not a complete list:

- artificial respiration
- artificial nutrition and hydration (nourishment and water provided by feeding tube)
- cardiopulmonary resuscitation (CPR)
- antipsychotic medication
- electric shock therapy
- antibiotics
- surgical procedures
- dialysis
- transplantation
- blood transfusions
- abortion
- sterilization

**Item (5)**
You must date and sign this Health Care Proxy form. If you are unable to sign yourself, you may direct someone else to sign in your presence. Be sure to include your address.

**Item (6)**
You may state wishes or instructions about organ and /or tissue donation on this form. New York law does provide for certain individuals in order of priority to consent to an organ and/or tissue donation on your behalf: your health care agent, your decedent's agent, your spouse , if you are not legally separated, or your domestic partner, a son or daughter 18 years of age or older, either of your parents, a brother or sister 18 years of age or older, a guardian appointed by a court prior to the donor's death.

**Item (7)**
Two witnesses 18 years of age or older must sign this Health Care Proxy form. The person who is appointed your agent or alternate agent cannot sign as a witness.

Kaleida Health | ECMC | general physician pc | Olean General Hospital (A Kaleida Health Facility) | Bradford Regional Medical Center (A Kaleida Health Facility) | Millard Fillmore Suburban Hospital (A Kaleida Health Facility) | Southtowns Surgery Center (A Kaleida Health Affiliate) | Harlem Road Ambulatory Surgery Center | Brooks Memorial Hospital | TLC Health Network | vna Visiting Nursing Association of Western New York | Cuba Memorial Hospital

## Your Information. Your Rights. Our Responsibilities.

**THIS JOINT PRIVACY NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY.**

Kaleida Health, Erie County Medical Center Corporation, General Physician, PC, Olean General Hospital, Bradford Regional Medical Center, Millard Fillmore Surgery Center, Southtowns Surgery Center, Harlem Road Ambulatory Surgery Center, Brooks-TLC Hospital System, Visiting Nursing Association of Western New York, and Cuba Memorial Hospital participate in an Organized Health Care Arrangement ("OHCA"). This allows us to share health information to carry out treatment, payment and joint health care operations relating to the OHCA, including shared storage or management of your information, health information exchange, financial and billing services, insurance, quality improvement, and risk management activities.

### Your Rights

You have the right to:

- Get a copy of your paper or electronic medical record
- Correct your paper or electronic medical record
- Request confidential communication
- Ask us to limit the information we share
- Get a list of those with whom we've shared your information
- Get a copy of this privacy notice
- Choose someone to act for you
- File a complaint if you believe your privacy rights have been violated

### Your Choices

You have some choices in the way that we use and share information as we:

- Tell family and friends about your condition
- Provide disaster relief
- Include you in a hospital directory
- Provide mental health care
- Market our services and sell your information
- Raise funds

## Our Uses and Disclosures

We may use and share your information as we:

- Treat you
- Run our organization
- Bill for your services
- Help with public health and safety issues
- Do research
- Comply with the law
- Respond to organ and tissue donation requests
- Work with a medical examiner or funeral director
- Address workers' compensation, law enforcement, and other government requests
- Respond to lawsuits and legal actions

## Your Rights

**When it comes to your health information, you have certain rights.** This section explains your rights and some of our responsibilities to help you.

**Get an electronic or paper copy of your medical record**

- You can ask to see or get an electronic or paper copy of your medical record and other health information we have about you. Ask us how to do this.
- We will provide a copy or a summary of your health information. We may charge a reasonable, cost-based fee.

**Ask us to correct your medical record**

- You can ask us to correct health information about you that you think is incorrect or incomplete. Ask us how to do this.
- We may say "no" to your request, but we'll tell you why in writing within 60 days.

**Request confidential communications**

- You can ask us to contact you in a specific way (for example, home or office phone) or to send mail to a different address.
- We will say "yes" to all reasonable requests.

**Ask us to limit what we use or share**

- You can ask us not to use or share certain health information for treatment, payment, or our operations. We are not required to agree to your request, and we may say "no" if it would affect your care.
- If you pay for a service or health care item out-of-pocket in full, you can ask us not to share that information for the purpose of payment or our operations with your health insurer. We will say "yes" unless a law requires us to share that information.

**Get a list of those with whom we've shared information**

- You can ask for a list (accounting) of the times we've shared your health information for six years prior to the date you ask, who we shared it with, and why.
- We will include all the disclosures except for those about treatment, payment, and health care operations, and certain other disclosures (such as any you asked us to make). We'll provide one accounting a year for free but will charge a reasonable, cost-based fee if you ask for another one within 12 months.

**Get a copy of this privacy notice**

You can ask for a paper copy of this notice at any time, even if you have agreed to receive the notice electronically. We will provide you with a paper copy promptly.

**Choose someone to act for you**

- If you have a person legally authorized to make health care decisions on your behalf, that person can exercise your rights and make choices about your health information.
- We will make sure the person has this authority and can act for you before we take any action.

**File a complaint if you feel your rights are violated**

- You can complain if you feel we have violated your rights by contacting the appropriate person below.
- You can file a complaint with the U.S. Department of Health and Human Services Office for Civil Rights by sending a letter to 200 Independence Avenue, S.W., Washington, D.C. 20201, calling 1-877-696-6775, or visiting **www.hhs.gov/ocr/privacy/hipaa/complaints/.**
- We will not retaliate against you for filing a complaint.

## Your Choices

**For certain health information, you can tell us your choices about what we share.** If you have a clear preference for how we share your information in the situations described below, talk to us. Tell us what you want us to do, and we will follow your instructions.

In these cases, you have both the right and choice to tell us to:

- Share information with your family, close friends, or others involved in your care
- Share information in a disaster relief situation
- Include your information in a hospital directory

*If you are not able to tell us your preference, for example if you are unconscious, we may go ahead and share your information if we believe it is in your best interest. We may also share your information when needed to lessen a serious and imminent threat to health or safety.*

In these cases we never share your information unless you give us written permission:

- Marketing purposes
- Sale of your information
- Most sharing of psychotherapy notes

In the case of fundraising:

We may contact you for fundraising efforts, but you can tell us not to contact you again.

## Our Uses and Disclosures

**How do we typically use or share your health information?**

We typically use or share your health information in the following ways.

**Treat you**

We can use your health information and share it with other professionals who are treating you. Some or all of your health information may be created and/or stored electronically and accessed by providers with authority or need or when permissible by law to do so.

Some or all of your health information may be made available electronically through a record locator service and electronic health information exchange with other treatment providers. Through the health information exchange, we may also be able to access prior treatment records and/or the location of those prior services.

*Example: A doctor treating you for an injury asks another doctor about your overall health condition.*

**Run our organization**
We can use and share your health information to run our practice, improve your care, and contact you when necessary.

*Example: We use health information about you to evaluate the performance of our staff*

**Bill for your services**
We can use and share your health information to bill and get payment from health plans or other entities.

*Example: We give information about you to your health insurance plan so it will pay for your services.*

## How else can we use or share your health information?

We are allowed or required to share your information in other ways – usually in ways that contribute to the public good, such as public health and research. We have to meet many conditions in the law before we can share your information for these purposes. For more information see: www.hhs.gov/ocr/privacy/hipaa/understanding/consumers/index.html.

**Help with public health and safety issues**

We can share health information about you for certain situations such as:

- Preventing disease
- Helping with product recalls
- Reporting adverse reactions to medications
- Reporting suspected abuse, neglect, or domestic violence
- Preventing or reducing a serious threat to anyone's health or safety

**Do research**
We can use or share your information for health research. We may request that you sign an authorization for certain types of research.

**Comply with the law**
We will share information about you if state or federal laws require it, including with the Department of Health and Human Services if it wants to see that we're complying with federal privacy law.

**Respond to organ and tissue donation requests**
We can share health information about you with organ procurement organizations.

**Work with a medical examiner or funeral director**
We can share health information with a coroner, medical examiner, or funeral director when an individual dies.

**Address workers' compensation, law enforcement, and other government requests**
We can use or share health information about you:

- For workers' compensation claims
- For law enforcement purposes or with a law enforcement official
- With health oversight agencies for activities authorized by law
- For special government functions such as military, national security, and presidential protective services

**Respond to lawsuits and legal actions**
We can share health information about you in response to a court or administrative order, or in response to a subpoena, subject to certain limitations of under state law.

## Our Responsibilities

- We are required by law to maintain the privacy and security of your protected health information.
- We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information.
- We must follow the duties and privacy practices described in this notice and give you a copy of it.
- We will not use or share your information other than as described here unless you tell us we can in writing. If you tell us we can, you may change your mind at any time. Let us know in writing if you change your mind.

For more information see: www.hhs.gov/ocr/privacy/hipaa/understanding/consumers/noticepp.html.

**Other Confidentiality Laws**

Other Federal and State laws may provide additional privacy protections for certain types of information. For example, special privacy protections apply to HIV-related information and behavioral health information (including alcohol and substance abuse treatment information and mental health information.) When another law is more strict than HIPAA that law will apply, and therefore, some parts of this Notice of Privacy Practices may not apply to these types of information.

**Organized Healthcare Arrangement**

- Because we are an OHCA, we can share information for treatment, payment, and operations related to the OCHA.
- The Entities that participate in the OHCA include:

  Kaleida Health
  Erie County Medical Center Corporation
  General Physician, PC
  Olean General Hospital
  Bradford Regional Medical Center
  Millard Fillmore Surgery Center
  Southtowns Surgery Center
  Harlem Road Ambulatory Surgery Center
  Brooks-TLC Hospital System
  Visiting Nursing Association of Western New York
  Cuba Memorial Hospital

## Changes to the Terms of this Notice

We can change the terms of this notice, and the changes will apply to all information we have about you. The new notice will be available upon request, in our facilities, and on our web site.

## Contact Information

Kaleida Health .......... Privacy Officer at 716-859-8633
Erie County Medical Center Corporation .......... Privacy Officer at 716-898-5880
General Physician, PC .......... Privacy Officer at 716-859-8517
Olean General Hospital .......... Privacy Officer at 716-375-7017
'ford Regional Medical Center .......... Privacy Officer at 716-375-7017
'llmore Surgery Center .......... Privacy Officer at 716-568-6161
Surgery Center .......... Privacy Officer at 716-859-7263
Ambulatory Surgery Center .......... Privacy Officer at 716-748-3600
pital System .......... Privacy Officer at 716-363-3077
sociation of Western New York .......... Privacy Officer at 716-859-8633
pital .......... Privacy Officer at 585-968-6773

1, 2022

Kaleida Health

# Patients Bill of Rights in a Hospital

**As a patient in a hospital in New York State, you have the right, consistent with law, to:**

(1) Understand and use these rights. If for any reason you do not understand or you need help, the hospital MUST provide assistance, including an interpreter.

(2) Receive treatment without discrimination as to race, color, religion, sex, gender identity, national origin, disability, sexual orientation, age or source of payment.

(3) Receive considerate and respectful care in a clean and safe environment free of unnecessary restraints.

(4) Receive emergency care if you need it.

(5) Be informed of the name and position of the doctor who will be in charge of your care in the hospital.

(6) Know the names, positions and functions of any hospital staff involved in your care and refuse their treatment, examination or observation.

(7) Identify a caregiver who will be included in your discharge planning and sharing of post-discharge care information or instruction.

(8) Receive complete information about your diagnosis, treatment and prognosis.

(9) Receive all the information that you need to give informed consent for any proposed procedure or treatment. This information shall include the possible risks and benefits of the procedure or treatment.

(10) Receive all the information you need to give informed consent for an order not to resuscitate. You also have the right to designate an individual to give this consent for you if you are too ill to do so. If you would like additional information, please ask for a copy of the pamphlet Deciding About Health Care A Guide for Patients and Families.

(11) Refuse treatment and be told what effect this may have on your health.

(12) Refuse to take part in research. In deciding whether or not to participate, you have the right to a full explanation.

(13) Privacy while in the hospital and confidentiality of all information and records regarding your care.

(14) Participate in all decisions about your treatment and discharge from the hospital. The hospital must provide you with a written discharge plan and written description of how you can appeal your discharge.

(15) Review your medical record without charge and, obtain a copy of your medical record for which the hospital can charge a reasonable fee. You cannot be denied a copy solely because you cannot afford to pay.

(16) Receive an itemized bill and explanation of all charges.

(17) View a list of the hospital s standard charges for items and services and the health plans the hospital participates with.

(18) Challenge an unexpected bill through the Independent Dispute Resolution process.

(19) Complain without fear of reprisals about the care and services you are receiving and to have the hospital respond to you and if you request it, a written response. If you are not satisfied with the hospital s response, you can complain to the New York State Health Department. The hospital must provide you with the State Health Department telephone number.

(20) Authorize those family members and other adults who will be given priority to visit consistent with your ability to receive visitors.

(21) Make known your wishes in regard to anatomical gifts. Persons sixteen years of age or older may document their consent to donate their organs, eyes and/or tissues, upon their death, by enrolling in the NYS Donate Life Registry or by documenting their authorization for organ and/or tissue donation in writing in a number of ways (such as a health care proxy, will, donor card, or other signed paper). The health care proxy is available from the hospital.

Public Health Law(PHL)2803 (1)(g)Patient s Rights, 10NYCRR, 405.7,405.7(a)(1),405.7(c)

BROWN, MONIQUE T [redacted]

Task Edit View Patient Chart Links Notifications Options Current Add Help

Home | Message Center | Patient List | Provider Handoff | Tracking Shell | Perioperative Tracking | Physician Worklist | Dynamic Worklist | Dynamic Worklist Import | MyExperience | Auto Text Utility | eCoach | Multi-Patient Task List | Invitations | Referral Management | Apache | Immunization Worklist

Lab Label Reprint | Charges | Kaleida Links | Verbal Order Review | VIS-CDC | Mosby | KH Policies | Lexicomp Drug | DMO | HEALTHeLINK | BloodProductAdministration

New Sticky Note | View Sticky Notes | Communicate | PM Conversation | Depart | AdHoc | Scheduling Appointment Book | Tear Off | Suspend | Charges | Exit | Calculator | Add | Patient Pharmacy | Batch Charge Entry | Scheduling Database Tools | Conversation Launcher | Report Builder

BROWN, MONIQUE T

BROWN, MONIQUE T

Care Team: View Details

Medication List

Add | Document Medication by Hx | Reconciliation | Check Interactions | External Rx History | Rx Plans (2): HUMANA MEDICARE

Reconciliation Status: Meds History | Admission | Discharge

Orders | Medication List

View: Orders for Signature; Medication List; Admit/Transfer/Discharge; Code Status/Advance; Vital Signs; Diet/Nutrition; Activity; Respiratory/Pulmonary; IV Fluids; Medications; Patient Care; Laboratory; Diagnostic Tests; Consults; PT/OT/Speech-Swallow; Support Services/R; Equipment; Charges; Non Categorized; Medical Supplies; Medication History; Medication History Snapshot; Reconciliation History

Displayed: All Active Orders | All Active Medications

Show More Orders

| Order Name | Status | Details |
|---|---|---|
| **IV Fluids** | | |
| [illegible] | Ordered | [illegible] |
| **Medications** | | |
| albuterol (albuterol (Eqv-ProAir HFA) 90 mcg/inh inh... | Documented | 1 puff, inhalation, QID, PRN as needed for wheezing, inhalation aerosol |
| aspirin (aspirin 325 mg oral tablet) | Documented | 325 mg = 1 tab, oral, Daily |
| atropine ophthalmic (atropine 1% ophthalmic solutio... | Ordered | 2 drops, ophthalmic soln, sublingual, q4h, PRN other (see comment), Indication: excessive oral sections, Start date: 02/22/24 12:57:00 EST |
| busPIRone (busPIRone 5 mg oral tablet) | Documented | 5 mg = 1 tab, oral, BID |
| castor oil-balsam Peru topical (Venelex topical ointm... | Ordered | 1 application, topical oint, topical, BID, Indication: wound care, Start date: 02/18/24 20:00:00 EST |
| fluticasone/umeclidinium/vilanterol (Trelegy Ellipta 1... | Documented | 1 puff, inhalation, Daily, at the same time every day, powder |
| guaiFENesin | Documented | 400 mg =, oral, q6h, PRN cough |
| ipratropium-albuterol (ipratropium-albuterol 0.5 mg-... | Prescribed | 3 mL, inhalation, q6h, PRN shortness of breath, copd, as needed for shortness of breath, 180 mL, Route to Pharmacy Electronically, HIGH STREET PRES CENTER, inhalation soln, 15 |
| levETIRAcetam (Keppra 500 mg oral tablet) | Documented | 500 mg = 1 tab, oral, BID |
| levETIRAcetam (Keppra) | Ordered | 250 mg = 2.5 mL, injection, IV push, BID, Indication: Seizure hx, Start date: 02/22/24 20:00:00 EST |
| lidocaine topical (lidocaine 4% patch) | Ordered | 1 patch, patch, topical, Daily, Indication: msk pain, Start date: 02/01/24 17:20:00 EST |
| linaclotide (Linzess 145 mcg oral capsule) | Documented | 145 mcg = 1 cap, oral, Daily, 30 cap, cap |
| melatonin (melatonin 5 mg oral tablet) | Documented | 5 mg = 1 tab, oral, qHS |
| methocarbamol (methocarbamol 500 mg oral tablet) | Documented | 500 mg = 1 tab, oral, TID, PRN as needed for pain, tab |
| metoprolol (metoprolol succinate XL 100 mg oral tab... | Documented | 100 mg = 1 tab, oral, Daily |
| midazolam (Versed) | Ordered | 1 mg = 1 mL, injection, IV push, q30min, PRN anxiety, Indication: Restlessness/anxiety, Start date: 02/22/24 13:32:00 EST, Duration: 7 days, Stop Date: 02/29/24 13:31:00 EST |
| morphine | Ordered | 2 mg = 1 mL, injection, IV push, q15min, PRN other (see comment), Indication: pain, Start date: 02/22/24 13:25:00 EST, Duration: 7 days, Stop Date: 02/29/24 13:24:00 EST |
| QUEtiapine (QUEtiapine 100 mg oral tablet) | Documented | 100 mg = 1 tab, oral, Daily, at bedtime |
| tamoxifen (tamoxifen 10 mg oral tablet) | Documented | 20 mg = 2 tab, oral, Daily |
| tiotropium-olodaterol (Stiolto Respimat 10 ACT 2.5 ... | Prescribed | 2 puff, inhalation, Daily, copd, 4 g, Route to Pharmacy Electronically, HIGH STREET PRES CENTER, inhalation aerosol, 154.94, cm, 12/08/23 8:44:00 EST, Height/Length Dosing, 43.5, |
| treprostinil (Tyvaso 0.6 mg/mL inhalation solution) | Prescribed | 3 puff, inhalation, QID, pulmonary hypertension, 28 each, Route to Pharmacy Electronically, Accredo, inhalation soln, 154.94, cm, 01/16/24 3:07:00 EST, Height/Length Dosing, 44, |
| treprostinil (Tyvaso 0.6 mg/mL inhalation solution) | Prescribed | 3 puff, inhalation, QID, pulmonary hypertension, 28 each, Print Requisition, inhalation soln |
| treprostinil (Tyvaso Starter Kit (Institutional) 0.6 mg/... | Prescribed | 3 puff, inhalation, QID, Pulmonary HTN, 3 puffs QID and increase as tolerated to max of 12 puffs QID, 28 each, Route to Pharmacy Electronically, TOPS PHARMACY # 250, inhalatio |

[redacted]

Details

Diagnoses & Problems | Related Results | Formulary Details

Orders Table | Orders For Cosignature | Orders For Signature

February [redacted]

# HEALTH CARE PROXY

**(1)** I, Monique T. Brown

hereby appoint Marty Rossevelt

*(name, home address and telephone number)*

[redacted] B/lo, (716) 390-9603

*as my health care agent to make any and all health care* decisions for me, except to the extent that I state otherwise. This proxy shall take effect only when and if I become unable to make my own health care decisions.

**(2) Optional: Alternate Agent**

If the person I appoint is unable, unwilling or unavailable to a[redacted]t, B/lo-
I hereby appoint Jmanice Collins-New, [redacted]

*(name, home address and telephone number)* (716)828-5361

as my health care agent to make any and all health care decisions for me, except to the extent that I state otherwise.

**(3)** Unless I revoke it or state an expiration date or circumstances under which it will expire, this proxy shall remain in effect indefinitely. (*Optional: if you want this proxy to expire, state the date or conditions here.)* This proxy shall expire *(specify date or conditions):*

**(4) Optional:** I direct my health care agent to make health care decisions according to my wishes and limitations, as he or she knows or as stated below. *(If you want to limit your agent's authority to make health care decisions for you or to give specific instructions, you may state your wishes or limitations here.)* I direct my health care agent to make health care decisions in accordance with the following limitations and/or instructions *(attach additional pages as necessary):*

In order for your agent to make health care decisions for you about artificial nutrition and hydration *(nourishment and water provided by feeding tube and intravenous line)*, your agent must reasonably know your wishes. You can either tell your agent what your wishes are or include them in this section. See instructions for sample language that you could use if you choose to include your wishes on this form, including your wishes about artificial nutrition and hydration.

**(5) Your Identification** *(please print)*

X Your Name Monique T. Brown

Your Signature Monique T. Brown Date 01/19/2024

Your Address [redacted], Bflo, N.Y. 14208

**(6) Optional: Organ, Eye and/or Tissue Donation**

I hereby make an anatomical gift, to be effective upon my death, of:
*(check any that apply)*

☐ Any needed organs, eyes and/or tissues

☐ The following organs, eyes and/or tissues ____________

☐ Limitations ____________

If you do not state your wishes or instructions about organ, eye and/or tissue donation on this form, it will not be taken to mean that you do not wish to make a donation or prevent a person, who is otherwise authorized by law, to consent to a donation on your behalf.

Your Signature ____________ Date ____________

N/A

**(7) Statement by Witnesses** *(Witnesses must be 18 years of age or older and cannot be the health care agent or alternate.)*

I declare that the person who signed this document is personally known to me and appears to be of sound mind and acting of his or her own free will. He or she signed (or asked another to sign for him or her) this document in my presence.

**Witness 1**

Date 1/19/24 1725

Name *(print)* Brianna Beyer

Signature Brianna K Beyer

Address 100 High St Buffalo NY

**Witness 2**

Date 1-19-24 1821

Name *(print)* Andrea Patterson

Signature Andrea Patterson

Address 100 High St Bflo, NY

NEW YORK STATE | Department of Health

NEW YORK STATE DEPARTMENT OF HEALTH

# Medical Orders for Life-Sustaining Treatment (MOLST)

This Medical Orders for Life-Sustaining Treatment (MOLST) form is generally for patients with advanced illness who require long-term care services and/or who might die within 1-2 years.* The MOLST may also be used for individuals who wish to avoid and/or receive specific life-sustaining treatments. A physician, nurse practitioner, or physician assistant reviews the patient's current health status, prognosis, goals for care, and the risks and benefits of each life-sustaining treatment with the patient if they have capacity, or the health care agent or surrogate if the patient lacks capacity.

All ethical and legal requirements must be followed, including special procedures when a patient has an intellectual or developmental disability and lacks capacity. If the patient has an intellectual or developmental disability (I/DD) and lacks the capacity to decide, the physician (not a nurse practitioner or physician's assistant) must follow special procedures and attach the completed Office for People with Developmental Disabilities (OPWDD) MOLST Legal Requirements Checklist for Individuals with I/DD before signing the MOLST. (OPWDD checklist available at https://opwdd.ny.gov/providers/health-care-decisions). For more information on requirements for completing the MOLST, see page 4.

This MOLST may not be changed without the consent of the patient (or their health care decision-maker if the patient lacks capacity). Completing a MOLST is voluntary and cannot be required. The patient should keep this original MOLST with them at all times, whenever they leave home and during travel to different care settings. The physician, nurse practitioner, or physician assistant keeps a copy. All health care professionals and emergency medical services (EMS) providers are required to follow these medical orders. HIPAA permits disclosure of MOLST to other health care professionals & electronic registry as necessary for treatment. For further information on MOLST, see https://www.health.ny.gov/professionals/patients/p...

BROWN MONIQUE T
MR- [redacted] PT- [redacted]
DOB- 08/02/69 AGE- 054Y SEX- F
PCP- [redacted]
FC- MED' I ADM DT- 01/15/24

## SECTION A Patient Information

MONIQUE BROWN

LAST NAME/FIRST NAME/MIDDLE INITIAL OF PATIENT

ADDRESS/CITY/STATE/ZIP

PREFERRED PHONE NUMBER | DATE OF BIRTH (MM/DD/YYYY) | eMOLST NUMBER (THIS IS NOT AN eMOLST FORM)

Check All Advance Directives Known to be Completed

☐ Health Care Proxy ☐ Living Will ☐ Organ Donation ☐ Documentation of an Oral Advance Directive

## SECTION B Resuscitation Instructions When the Patient Has No Pulse and/or Is Not Breathing

Check one:

☒ CPR Order: Attempt Cardio-Pulmonary Resuscitation

☐ DNR Order: Do Not Attempt Resuscitation (Allow Natural Death)

## SECTION C Orders for Life-Sustaining Treatment When the Patient Has a Pulse and is Breathing

**Respiratory Support: Non-invasive Ventilation and/or Intubation and Mechanical Ventilation**

Check one:
☒ Intubation and long-term mechanical ventilation, includes tracheostomy
☐ A trial of non-invasive ventilation and/or intubation and mechanical ventilation*
☐ A trial of non-invasive ventilation only; if fails, Do Not Intubate*
☐ Do Not Intubate (DNI) and Do Not Use Non-invasive Ventilation or Mechanical Ventilation

**Future Hospitalization/Transfer**

Check one:
☒ Send to the hospital, when medically necessary
☐ Send to the hospital only if pain and severe symptoms cannot be controlled
☐ Do not send to the hospital

## SECTION D Consent for Sections B and C

M

SIGNATURE OF INDIVIDUAL MAKING DECISIONS

MONIQUE BROWN

PRINTED NAME OF INDIVIDUAL MAKING DECISIONS

☒ Verbal consent, leave signature line blank

2/3/24 13:37

DATE/TIME OF CONSENT

Who is the individual making decisions:

☒ Patient ☐ Health Care Agent ☐ FHCDA Surrogate ☐ Minor's Parent/Guardian ☐ §1750-b Surrogate for Individual with I/DD

[signature]

PRINTED NAME OF FIRST WITNESS*

THOMAS PIEKUT M.D.

PRINTED NAME OF SECOND WITNESS

*If this decision relates to an individual with an intellectual or developmental disability, refer to the instructions on page 4 before proceeding.

## SECTION E Physician/Nurse Practitioner/Physician Assistant Signature for Sections B and C

If Section D is completed by a §1750-b Surrogate, a physician must sign this Section E. Prior to the physician signing this Section E when Section D is completed by a §1750-b Surrogate, the physician must complete and attach the OPWDD Checklist.

[signature]

SIGNATURE

MUSA SAEED M.D.

PRINT NAME

302249

LICENSE NUMBER

2/3/24 1545

DATE/TIME

Brown, Monique — 8/8/1969
LAST NAME/FIRST NAME/MIDDLE INITIAL OF PATIENT — DATE OF BIRTH (MM/DD/YYYY)

## SECTION F Additional Orders for Life-Sustaining Treatment

VOID

**TREATMENT GUIDELINES**

Check one:

- ☒ No limitation on medical interventions
- ☐ Limited medical interventions, only as described below
- ☐ Comfort measures only. Provide medical care and treatment with the primary goal of relieving pain and other symptoms

**ARTIFICIALLY ADMINISTERED FLUID AND NUTRITION**

**FEEDING TUBE**

Check one:
- ☐ Long term feeding tube
- ☒ Determine use or limitation if need arises*
- ☐ No feeding tube

**IV FLUIDS**

Check one:
- ☒ IV fluids
- ☐ Determine use or limitation as need arises*
- ☐ No IV fluids

**ANTIBIOTICS**

Check one:
- ☒ Use antibiotics to treat infections
- ☐ Determine use or limitation of antibiotics when infection occurs*
- ☐ Do not use antibiotics.

**DIALYSIS**

Check one:
- ☐ Use dialysis to treat renal failure
- ☒ Determine use or limitation if renal failure occurs*.
- ☐ Do not use dialysis

**OTHER MEDICAL ORDERS AND INSTRUCTIONS** (only as discussed with the physician, NP, or PA. May include instructions and goals for trials*. If nothing else is discussed, write NONE.)

## SECTION G Consent for Section F

SIGNATURE OF INDIVIDUAL MAKING DECISIONS

MONIQUE BROWN
PRINTED NAME OF INDIVIDUAL MAKING DECISIONS

☒ Verbal consent, leave signature line blank

2/3/24 13:37
DATE/TIME OF CONSENT

Who is the individual making decisions:

☒ Patient ☐ Health Care Agent ☐ FHCDA Surrogate ☐ Minor's Parent/Guardian* ☐ §1750-b Surrogate for individual with I/DD

Juanice Collins-New
PRINTED NAME OF FIRST WITNESS

THOMAS PIERCE M.D.
PRINTED NAME OF SECOND WITNESS

*If this decision relates to an individual with an intellectual or developmental disability, refer to the instructions on page 4 before proceeding.

## SECTION H Physician/Nurse Practitioner/Physician Assistant Signature for Section F

If consent for this order was provided by a §1750-b Surrogate for an individual with an intellectual or developmental disability, only a physician may sign this section, and only after the OPWDD MOLST Legal Requirements Checklist for Individuals with I/DD has been completed and attached.

[signature]
SIGNATURE

MUSA SAEED M.D.
PRINT NAME

302249
LICENSE NUMBER

2/4/24 1550
DATE/TIME



This MOLST form has been approved by the NYSDOH for use in all settings.

Brown Monique — LAST NAME/FIRST NAME/MIDDLE INITIAL OF PATIENT

8/2/1969 — DATE OF BIRTH (MM/DD/YYYY)

## SECTION I Review and Renewal

[P]hysician, nurse practitioner, or physician assistant should review this form at least every 90 days and whenever the patient or other decisionmaker [cha]nges their mind about treatment. The MOLST should also be reviewed if the patient moves from one location to another to receive care, or if the [pati]ent has a major change in health status (for better or worse).

[Thi]s MOLST remains valid and must be followed even if it has not been reviewed in the 90-day period.

| Date/Time | Reviewer's Printed Name and Signature | Location of Review | Outcome of Review |
|---|---|---|---|
| | | | ☐ No change<br>☐ Form changed, new form completed<br>☐ Form voided, no new form |
| | | | ☐ No change<br>☐ Form changed, new form completed<br>☐ Form voided, no new form |
| | | | ☐ No change<br>☐ Form changed, new form completed<br>☐ Form voided, no new form |
| | | | ☐ No change<br>☐ Form changed, new form completed<br>☐ Form voided, no new form |
| | | | ☐ No change<br>☐ Form changed, new form completed<br>☐ Form voided, no new form |
| | | | ☐ No change<br>☐ Form changed, new form completed<br>☐ Form voided, no new form |
| | | | ☐ No change<br>☐ Form changed, new form completed<br>☐ Form voided, no new form |
| | | | ☐ No change<br>☐ Form changed, new form completed<br>☐ Form voided, no new form |
| | | | ☐ No change<br>☐ Form changed, new form completed<br>☐ Form voided, no new form |
| | | | ☐ No change<br>☐ Form changed, new form completed<br>☐ Form voided, no new form |
| | | | ☐ No change<br>☐ Form changed, new form completed<br>☐ Form voided, no new form |

LAST NAME/FIRST NAME/MIDDLE INITIAL OF PATIENT DATE OF BIRTH (MM/DD/YYYY)

In addition to the MOLST form, the New York State Department of Health and OPWDD have developed legal requirements checklists and instructions to assist in the proper completion of the MOLST. The checklists are intended to assist providers in satisfying the ethical and legal requirements associated with decisions concerning life-sustaining treatment for all patients.

**Adult Patients**

The instructions and legal requirements checklists for adult patients can be found at www.health.ny.gov/professionals/patients/patient_rights/molst/. For adult patients, there are five different checklists. The correct checklist should be chosen based on the patient's decision-making capacity and the setting.

- **Checklist #1** Adult patients with medical decision-making capacity - any setting
- **Checklist #2** Adult patients without medical decision-making capacity who have a health care proxy - any setting
- **Checklist #3** Adult hospital, hospice or nursing home patients without medical decision-making capacity who do not have a health care proxy, decision-maker is Public Health Law Surrogate
- **Checklist #4** Adult hospital, hospice or nursing home patients without medical decision-making capacity who do not have a health care proxy and for whom no surrogate from the list is available
- **Checklist #5** Adult patients without medical decision-making capacity who do not have a health care proxy, and the MOLST form is being completed in the community

A Public Health Law Surrogate (aka a FHCDA Surrogate) means a surrogate under Public Health Law Article 29-CC (the Family Health Care Decisions Act).

**Minor Patients**

The instructions and legal requirements checklists for minor patients can be found at: www.health.ny.gov/professionals/patients/patient_rights/molst/

**Individuals with Intellectual or Developmental Disabilities (I/DD)**

The law governing the decision-making process differs for individuals with I/DD. Surrogate's Court Procedure Act Section 1750-b (SCPA 1750-b) must be followed when making a decision for an individual with I/DD who is determined to lack capacity and who does not have a health care proxy.

- **Sections E and H of this form may only be signed by a physician, not a nurse practitioner or physician's assistant.**
- **In sections D and G of this form, one witness must be the individual's treating physician.**
- **Completion of the OPWDD MOLST Legal Requirements Checklist for Individuals with I/DD, including notification of certain parties and resolution of any objections, is mandatory prior to completion of a MOLST.**
- **Both the OPWDD MOLST Legal Requirements Checklist for Individuals with I/DD and SCPA 1750-b process apply to individuals with I/DD, regardless of their age or residential setting.**
- **Decisions to withhold or withdraw life sustaining treatment (LST) for an individual with I/DD must be specifically listed and described in step 2 of the OPWDD MOLST Legal Requirements Checklist for Individuals with I/DD** and only after the surrogate has had a discussion with the individual's treating physician regarding their medical condition, possible treatment options and goals for care. SCPA 1750-b also requires that two physicians determine that the individual's condition meets specific medical criteria at the time the request to withhold or withdraw treatment is being made, including that the provision of the life sustaining treatment would impose an extraordinary burden on the individual. These requirements are included in step 4 of the OPWDD MOLST Legal Requirements Checklist for Individuals with I/DD. **The individual's medical condition for the purposes of a request to withhold or withdraw LST must never include consideration of their intellectual or developmental disability.**
- Trials for an individual with I/DD: Whether or not a new checklist is required following an unsuccessful trial of LST depends on the parameters of the trial, as specified in step 2 of the OPWDD MOLST Legal Requirements Checklist for Individuals with I/DD. **If a trial period is open ended, and the authorized surrogate subsequently decides to request withdrawal of the LST, a new checklist is required.**

The complete instructions and legal requirements checklists for people with intellectual or developmental disabilities can be found at: www.opwdd.ny.gov/providers/health-care-decisions or at www.health.ny.gov/professionals/patients/patient_rights/molst/.

ELAINE DAVID - 716-859-2536

NEW YORK STATE DEPARTMENT OF HEALTH

# Medical Orders for Life-Sustaining Treatment (MOLST)

This Medical Orders for Life-Sustaining Treatment (MOLST) form is generally for patients with advanced illness who require long-term care services and/or who might die within 1-2 years.* The MOLST may also be used for individuals who wish to avoid and/or receive specific life-sustaining treatments. A physician, nurse practitioner, or physician assistant reviews the patient's current health status, prognosis, goals for care, and the risks and benefits of each life-sustaining treatment with the patient if they have capacity, or the health care agent or surrogate if the patient lacks capacity.

All ethical and legal requirements must be followed, including special procedures when a patient has an intellectual or developmental disability and lacks capacity. If the patient has an intellectual or developmental disability (I/DD) and lacks the capacity to decide, the physician (not a nurse practitioner or physician's assistant) must follow special procedures and attach the completed Office for People with Developmental Disabilities (OPWDD) MOLST Legal Requirements Checklist for Individuals with I/DD before signing the MOLST. (OPWDD checklist available at **https://opwdd.ny.gov/providers/health-care-decisions**). For more information on requirements for completing the MOLST, see page 4.

This MOLST may not be changed without the consent of the patient (or their health care decision-maker if the patient lacks capacity). Completing a MOLST is voluntary and cannot be required. The patient should keep this original MOLST with them at all times, whenever they leave home and during travel to different care settings. The physician, nurse practitioner, or physician assistant keeps a copy. All health care professionals and emergency medical services (EMS) providers are required to follow these medical orders. HIPAA permits disclosure of MOLST to other health care professionals & electronic registry as necessary for treatment. For further information on MOLST, see **https://www.health.ny.gov/professionals/patients/patient_rights/molst/**

## SECTION A Patient Information

Brown Monique

LAST NAME/FIRST NAME/MIDDLE INITIAL OF PATIENT

[redacted] BFLO, NY 14208

ADDRESS/CITY/STATE/ZIP

PREFERRED PHONE NUMBER

8/2/1969

DATE OF BIRTH (MM/DD/YYYY)

eMOLST NUMBER (THIS IS NOT AN eMOLST FORM)

**Check All Advance Directives Known to be Completed**

☒ Health Care Proxy ☐ Living Will ☐ Organ Donation ☐ Documentation of an Oral Advance Directive

## SECTION B Resuscitation Instructions When the Patient Has No Pulse and/or Is Not Breathing

Check **one**:

☐ **CPR Order: Attempt Cardio-Pulmonary Resuscitation**

☒ **DNR Order: Do Not Attempt Resuscitation (Allow Natural Death)**

## SECTION C Orders for Life-Sustaining Treatment When the Patient Has a Pulse and Is Breathing

**Respiratory Support: Non-invasive Ventilation and/or Intubation and Mechanical Ventilation**

Check **one**:
- ☐ Intubation and long-term mechanical ventilation, includes tracheostomy
- ☐ A trial of non-invasive ventilation and/or intubation and mechanical ventilation*
- ☐ A trial of non-invasive ventilation only; if fails, Do Not Intubate*
- ☒ Do Not Intubate (DNI) and Do Not Use Non-invasive Ventilation or Mechanical Ventilation

**Future Hospitalization/Transfer**

Check **one**:
- ☐ Send to the hospital, when medically necessary
- ☒ Send to the hospital only if pain and severe symptoms cannot be controlled
- ☐ Do not send to the hospital

## SECTION D Consent for Sections B and C

[signature]

SIGNATURE OF INDIVIDUAL MAKING DECISIONS

Roosevelt Mitchell

PRINTED NAME OF INDIVIDUAL MAKING DECISIONS

☐ Verbal consent, leave signature line blank

2/22/24 1236

DATE/TIME OF CONSENT

**Who is the individual making decisions:**

☐ Patient ☒ Health Care Agent ☐ FHCDA Surrogate ☐ Minor's Parent/Guardian ☐ §1750-b Surrogate for individual with I/DD

Juanice Collins - Nem 2/22/24

PRINTED NAME OF FIRST WITNESS*

[signature]

PRINTED NAME OF SECOND WITNESS

*If this decision relates to an individual with an intellectual or developmental disability, refer to the instructions on page 4 before proceeding.

## SECTION E

If Section D is completed by a §1750-b Surrogate, a physician must sign this Section E. Prior to the physician signing this Section E when Section D is completed by a §1750-b Surrogate, the physician must complete and attach the OPWDD Checklist.

Nicole Converso PA

SIGNATURE

Nicole Converso PA

PRINT NAME

012006

LICENSE NUMBER

2/22/24 1240 pm

DATE/TIME

Brown, Monique
LAST NAME/FIRST NAME/MIDDLE INITIAL OF PATIENT

1/2/1969
DATE OF BIRTH (MM/DD/YYYY)

## SECTION F Additional Orders for Life-Sustaining Treatment

### TREATMENT GUIDELINES

Check one:

- ☐ No limitation on medical interventions
- ☐ Limited medical interventions, only as described below
- ☒ Comfort measures only. Provide medical care and treatment with the primary goal of relieving pain and other symptoms

### ARTIFICIALLY ADMINISTERED FLUID AND NUTRITION

**FEEDING TUBE**

Check one:

- ☐ Long term feeding tube
- ☐ Determine use or limitation if need arises*
- ☒ No feeding tube

**IV FLUIDS**

Check one:

- ☐ IV fluids
- ☐ Determine use or limitation as need arises*
- ☐ No IV fluids

### ANTIBIOTICS

Check one:

- ☐ Use antibiotics to treat infections
- ☒ Determine use or limitation of antibiotics when infection occurs*
- ☐ Do not use antibiotics

### DIALYSIS

Check one:

- ☐ Use dialysis to treat renal failure
- ☐ Determine use or limitation if renal failure occurs*
- ☒ Do not use dialysis

**OTHER MEDICAL ORDERS AND INSTRUCTIONS** (only as discussed with the physician, NP, or PA. May include instructions and goals for trials*. If nothing else is discussed, write NONE.)

Medications for comfort only
no further Labs, x-rays, diagnostics

## SECTION G Consent for Section F

Roosevelt Mitchell
SIGNATURE OF INDIVIDUAL MAKING DECISIONS

Roosevelt Mitchell
PRINTED NAME OF INDIVIDUAL MAKING DECISIONS

☐ Verbal consent, leave signature line blank

2/22/24 1240
DATE/TIME OF CONSENT

Who is the individual making decisions:

☐ Patient ☒ Health Care Agent ☐ FHCDA Surrogate ☐ Minor's Parent/Guardian ☐ §1750-b Surrogate for Individual with I/DD

Juanice Collins-New 2/22/24
PRINTED NAME OF FIRST WITNESS

S. Marie
PRINTED NAME OF SECOND WITNESS

*If this decision relates to an individual with an intellectual or developmental disability, refer to the instructions on page 4 before proceeding.

## SECTION H Physician/Nurse Practitioner/Physician Assistant Signature for Section F

If consent for this order was provided by a §1750-b Surrogate for an individual with an intellectual or developmental disability, only a physician may sign this section, and only after the OPWDD MOLST Legal Requirements Checklist for Individuals with I/DD has been completed and attached.).

Nicole Converso PA
SIGNATURE

Nicole Converso PA
PRINT NAME

012006
LICENSE NUMBER

2/22/24 1240pm
DATE/TIME



This MOLST form has been approved by the NYSDOH for use in all settings.

# Exhibit B

Estate of Monique T. Brown

July 30, 2024

Kaleida Health
Buffalo General Hospital
100 High Street
Buffalo, NY 14203

Re: Litigation Hold Notice - Monique T. Brown (DOB: 8/2/1969)

To Whom It May Concern:

This letter serves as formal notice that the family of Monique T. Brown is pursuing legal action against Buffalo General Hospital and Kaleida Health related to the alleged medication overdose and death of Ms. Brown on February 23, 2024. **You are hereby directed to immediately preserve all documents, data, and tangible things that may be relevant to this matter for the period of January 1, 2024 to June 1, 2024.**

Ms. Brown's death raises troubling questions about the quality of care provided to African American patients in your facility. According to an eyewitness account, more than 200 mg of morphine was administered within a 12-hour period. This amount raises serious questions about potential overdose and negligence in patient care.

We strongly urge you to comply with this litigation hold for the following reasons:

1. Duty to preserve evidence: As established in Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 218 (S.D.N.Y. 2003), once a party reasonably anticipates litigation, they have a duty to preserve potentially relevant evidence. This letter is notice to trigger this duty.

2. Risk of sanctions: Failure to preserve relevant evidence after receiving notice of potential litigation could result in severe sanctions, as demonstrated in Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC, 685 F. Supp. 2d 456 (S.D.N.Y. 2010).

3. Ethical obligations: As a healthcare organization, Kaleida Health has ethical duties to patients and their families. Ignoring a good faith request to preserve evidence related to patient care could be seen as a violation of these ethical standards.

4. Public trust: Failing to respond appropriately to a family's concerns about a patient's death could severely damage public trust in Kaleida Health.

The types of information to be preserved include, but are not limited to:

1. Automated Dispensing Cabinet (ADC) Records:
    i. Complete transaction logs for morphine and midazolam dispensing
    ii. User access logs
    iii. Override records
    iv. Alert and warning logs
    v. System settings and configuration data
    vi. Maintenance records
    vii. Any and all further related electronic or physical records, notes, phone logs, security logs, data and communications

2. Electronic Health Records (EHR):
    i. Full audit trail of medication orders and administration
    ii. Physician orders and nursing notes
    iii. Medication Administration Records (MARs)
    iv. Pain management documentation
    v. Any and all further related electronic or physical records, notes, phone logs, security logs, data and communications

3. Pharmacy Records:
    i. Inventory logs for morphine and midazolam
    ii. Restocking records
    iii. Internal audits or discrepancy reports
    iv. Any and all further related electronic or physical records, notes, phone logs, security logs, data and communications

4. Hospital Policies and Procedures:
    i. Controlled substance management protocols
    ii. ADC usage guidelines
    iii. Medication administration policies
    iv. Override procedures
    v. Any and all further related electronic or physical records, notes, phone logs, security logs, data and communications

5. Staff Training Records:
    i. Documentation of training on medication administration and ADC use

   ii. Any and all further related electronic or physical records, notes, phone logs, security logs, data and communications

6. Billing and Insurance Records:
   i. Itemized bills for Ms. Brown's stay from January 7, 2024 to March 1, 2024
   ii. Records of charges for morphine and midazolam
   iii. Communications with insurance providers
   iv. Any and all further related electronic or physical records, notes, phone logs, security logs, data and communications

7. Quality Assurance/Risk Management Reports:
   i. Any internal investigations or incident reports related to this case
   ii. Any and all further related electronic or physical records, notes, phone logs, security logs, data and communications

8. Video Surveillance:
   i. Security camera footage of ADC areas from January 7, 2024 to March 1, 2024
   ii. Any and all further related electronic or physical records, notes, phone logs, security logs, data and communications

9. Staff Communications:
   i. Emails, text messages, or other communications related to Ms. Brown's care or the incident
   ii. Any and all further related electronic or physical records, orders, notes, phone logs, security logs, data and communications

10. Regulatory Compliance Documentation:
   i. Records demonstrating compliance with DEA regulations on controlled substances
   ii. Any and all further related electronic or physical records, notes, phone logs, security logs, data and communications

11. Morphine and Midazolam Usage Records:
   i. Records of morphine and midazolam orders, deliveries, and usage from January 1, 2024 to June 1, 2024
   ii. Any and all further related electronic or physical records, notes, phone logs, security logs, data and communications

12. Hospital Morgue Records:
   i. Any autopsy reports or findings

ii. Toxicology reports and underlying data
iii. Photographs or videos taken during examination
iv. Notes, observations, or records made by morgue staff
v. Body diagrams or sketches
vi. Evidence inventory and disposition records
vii. Documentation of body transport and chain of custody
viii. Results of any additional tests or examinations performed
ix. Records of medication or personal effects that accompanied the body
x. Any correspondence or communication related to Ms. Brown's case
xi. Any and all further related electronic or physical records, notes, phone logs, security logs, data and communications

Please also include any internal correspondence with Ms. Brown's family members or among hospital staff about Ms. Brown or her family members, and correspondence related to Ms. Brown's care and her family's concerns about her care. This includes all records, communications, and documentation related to the three calls Kaleida Health staff made to hospital security when Ms. Brown's healthcare proxies requested copies of her medication list in the days preceding her death.

This demand encompasses all records, communications, documentation, and metadata related to the three (3) security calls/requests made by Kaleida Health staff to uniformed hospital security detail in the days preceding Ms. Brown's death when Ms. Brown's healthcare proxies requested copies of her medication list in the days immediately preceding her death. This includes, but is not limited to, audio recordings, transcripts, internal memos, emails, text messages, handwritten notes, security logs, and any other form of communication or documentation, whether electronic or physical, that pertains to these incidents. Furthermore, we demand preservation of all records indicating who accessed Ms. Brown's protected health information during this period, in accordance with HIPAA audit trail requirements as specified in 45 C.F.R. §164.312(b) (requiring covered entities to "implement hardware, software, and/or procedural mechanisms that record and examine activity in information systems that contain or use electronic protected health information").

The loss of a loved one is a tragedy that no family should endure. Your cooperation in preserving this crucial evidence is not just a legal obligation, but a moral imperative. The eyes of the community are upon Kaleida Health, and your response to this request will speak volumes about your commitment to patient safety, equality in healthcare, and transparency.

Please ensure that all auto-delete functions are suspended for relevant electronic records and that all employees are notified of their obligation to preserve potentially relevant information.

This hold remains in effect until you receive written notice that it has been lifted. Failure to comply with this litigation hold may result in causes of action for spoliation of evidence, as well as irreparable damage to Kaleida Health's reputation and the trust placed in you by the community.

If you have any questions about the scope of this hold, please contact us immediately. We are prepared to pursue all legal avenues necessary to ensure justice for Ms. Brown and to prevent such tragedies from befalling other patients of color.

Sincerely,

Juanice Rene Collins-New
Administrator/Administratrix of the Estate of Monique T. Brown
P.O. Box 209
Buffalo, NY 14215

estateofmoniquebrown@gmail.com

cc: Alyson Spaulding, Kaleida Health General Counsel and Legal Department
cc: Michael Hughes, Kaleida Health Administrative and Media Relations Department
cc: Courtney Starnes, Kaleida Health IT Department